**44**

GARY IBELLO
FIREMAN'S FUND vs. ONEBEACON INSURANCE

April 01, 2015
1

```
 1                        Ibello

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    -----------------------------x
      FIREMAN'S FUND INSURANCE COMPANY,
 4
                   Plaintiff,
 5
            vs.        Case No. 14 CV 4718
 6
      ONEBEACON INSURANCE COMPANY as
 7    successor-in-interest to
      GENERAL ACCIDENT INSURANCE
 8    COMPANY OF AMERICA,

 9                 Defendant.
      -----------------------------x
10

11

12                  GARY IBELLO

13           New York, New York

14         Wednesday, April 1, 2015

15

16

17

18

19

20

21

22

23    Reported by:  Steven Neil Cohen, RPR

24    Job No. 309212

25
```



```
 1                      Ibello
 2      A.    Yes.
 3      Q.    I am not going to ask you to guess
 4  but I am asking you to use your best
 5  knowledge when you answer questions and your
 6  best memory.
 7            I understand and we will talk
 8  about it in a minute that you are here not
 9  only in your individual capacity with
10  respect to your work on these claims or this
11  claim, rather, but also as a Rule 30(b)(6)
12  witness.
13            Are you aware of that?
14      A.    Yes.
15      Q.    Have you seen the notice of
16  deposition relating to that notice?
17      A.    Yes.
18      Q.    Could you tell us what you did to
19  prepare for the deposition today?
20      A.    I reviewed documents, had a
21  telephone conference and a meeting with
22  Fireman's Fund's counsel in this matter.
23      Q.    And that is Mr. Schwartz?
24      A.    Yes.
25      Q.    Okay.  Was there anybody else
```

```
 1                    Ibello
 2    evaluating the claim and securing management
 3    approval for various reserve
 4    recommendations.
 5         Q.    Who was the claim team?
 6         A.    Dan Kane, Eric Billeter were the
 7    primary ones and we worked with an internal
 8    actuary by the name of Madelyn Faggella.
 9         Q.    What was Ms. Faggella's role?
10         A.    She is an actuary, reserving
11    actuary at Fireman's Fund.
12         Q.    And exactly what did you do in
13    that capacity with respect to this claim?
14         A.    Basically over the life of the
15    claim as they were -- would make
16    recommendations on the -- reserving the
17    claim I would work with them on reviewing
18    that recommendation and when necessary
19    presenting that to senior management for
20    approval.
21         Q.    Did you have any input into how
22    the claim was modeled for purposes of
23    exposure to Fireman's Fund?
24         A.    I would have been involved in some
25    of the discussions around the modeling, yes.
```



```
 1                        Ibello
 2        Q.     Who does the allocation?  That is
 3    my question.
 4        A.     Generally it would be -- it could
 5    be the underlying insurance carriers, it
 6    could be the insured.
 7        Q.     Is the concept of exhaustion a
 8    general insurance concept or is it a
 9    contractual one that you find in your
10    policies?
11        A.     I would say it is both.
12        Q.     Okay.  With respect to the
13    Fireman's Fund policies are you aware that
14    there are exhaustion provisions, when I say
15    the "policies" I mean the three policies
16    that were involved in the ASARCO litigation.
17               Do you understand what we are
18    talking about?
19        A.     Yes.
20        Q.     Are there contractual provisions
21    in those policies that relate to exhaustion?
22        A.     Yes.
23        Q.     Without looking at the policy do
24    you know what those provisions are, what
25    they are captioned or called?
```

```
                          Ibello
 1
 2        A.    I prefer to see the wording but --
 3        Q.    What is your general understanding
 4   of where those provisions are found?
 5        A.    Generally -- well, it is in the --
 6   generally in the -- up front in the insuring
 7   agreement and then there is usually a
 8   schedule of underlying insurance.
 9        Q.    Turn to the next page please.  Let
10   me strike that.
11             Let's go back to the prior page.
12             Under C, your liability
13   evaluation, it states, "The XLX blanket
14   excess liability policies at issue on Form
15   5902-2-72 all provide that the company will
16   indemnify the insured for the insured's
17   ultimate net loss in excess of the
18   underlying of the insurance underlying the
19   XLX policies."
20             Do you see that?
21        A.    Yes.
22        Q.    That is what you are referring to
23   there being underlying limits, correct?
24        A.    Yes.
25        Q.    So would it be fair to say that
```



```
 1                    Ibello
 2    the Fireman's Fund policies don't attach
 3    until there is exhaustion of those
 4    underlying limits?
 5         A.    Yes.
 6         Q.    Looking down to the next full
 7    paragraph it states, "The insurance afforded
 8    by the policies is subject to the same
 9    warranties, terms, conditions and exclusions
10    as are contained in the underlying insurance
11    except unless otherwise specifically
12    afforded in the XLX policies any premium the
13    obligation to investigate and defend the
14    amounts and limits of liability in any
15    renewal agreement."
16            Do you understand what that means?
17            MR. SCHWARTZ:  Just one
18         clarification.  You said "afforded"
19         instead of "provided."  That is not a
20         big deal.
21            MR. KING:  Okay.  Please can you
22         make that correction, "afforded" as
23         opposed to "provided"?
24            MR. SCHWARTZ:  No.  "Provided."
25
```



Case 1:14-cv-04718-PGG   Document 47-1   Filed 07/06/15   Page 8 of 44

GARY IBELLO                                         April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                        49

| | |
|---|---|
| 1 | Ibello |
| 2 | First of all, do you know who |
| 3 | established that reserve of $1 million to |
| 4 | each policy? |
| 5 | A.    Well, when you say "established," |
| 6 | the claims handler, in this case, Dan, would |
| 7 | have recommended that reserve to his |
| 8 | manager, Mr. Billeter and at this time I |
| 9 | can't recall if that was within |
| 10 | Mr. Billeter's authority then he probably |
| 11 | would have posted it.  If not then they |
| 12 | would have sent it to me for approval. |
| 13 | Q.    In that next paragraph or the next |
| 14 | sentence down that I read where it says, "To |
| 15 | date ASARCO has not submitted sufficient |
| 16 | information to establish exhaustion," do you |
| 17 | understand what Mr. Kane means by that? |
| 18 | A.    Yes. |
| 19 | Q.    What does he mean? |
| 20 | A.    It means that ASARCO had not |
| 21 | submitted sufficient information to us for |
| 22 | us to establish exhaustion. |
| 23 | Q.    What would have established |
| 24 | exhaustion to Fireman's Fund? |
| 25 | A.    Information on their claims |



```
 1                     Ibello
 2    history showing that they had sufficient
 3    claims that were allocated to these policy
 4    years on a basis that we agreed with that
 5    exhausted the amount of the underlying
 6    limits.
 7         Q.    What do you mean by "that we
 8    agreed with"?
 9         A.    Well, there were a lot of disputes
10    already at this stage of the claim regarding
11    primarily the asbestosis exclusion, whether
12    or not the policies paid defense costs.
13         Q.    Just going back to the defense
14    costs issue what was the basis of the
15    dispute regarding whether or not the
16    policies paid defense costs?
17         A.    Whether or not they paid defense
18    costs.
19         Q.    On what basis was there a dispute?
20    Was there a provision in the policy relating
21    to defense costs?
22         A.    Yes.   There is a provision in the
23    policy regarding expenses.
24         Q.    Was there a dispute between
25    Fireman's Fund and ASARCO regarding the
```



GARY IBELLO
FIREMAN'S FUND vs. ONEBEACON INSURANCE

April 01, 2015
61

```
 1                    Ibello
 2      Q.    Did you see any evaluation of or
 3   assessment of whether your policies require
 4   the actual payment of limits under the
 5   policies in order to have underlying
 6   exhaustion?
 7      A.    I am familiar with our policy
 8   language and it requires exhaustion.
 9      Q.    And when you used the term
10   "exhaustion" in that context tell me exactly
11   what you mean by it.
12      A.    That claims appropriately
13   allocated to that policy period have been
14   resolved that equal the amount of the stated
15   underlying insurance.
16          MR. SCHWARTZ:  When you reach an
17       appropriate place we can take a break,
18       whenever you want.
19          MR. KING:  Sure.  We can take a
20       break right now.
21          (Recess)
22          MR. KING:  Mark this as Exhibit
23       7.
24          (Memo dated 6/18/2004 was marked
25   Defendant's Exhibit 7 for identification)
```



1                        Ibello

2               (Cover note for the period March

3        15, 1983 to March 15, 1984 was marked

4        Defendant's Exhibit 18 for identification)

5               MR. KING:  Exhibit 19.

6               (Two pages of a General Accident

7        Insurance Company of America facultative

8        participation on a Fireman's Fund policy of

9        insurance. was marked Defendant's Exhibit 19

10       for identification)

11   BY MR. KING:

12       Q.    Mr. Ibello, back on the record.

13             Exhibit 11 is a document from

14       Lawrence Levy of Rivkin Radler.  They were

15       the trial counsel for Fireman's Fund and

16       ASARCO, right?

17       A.    Yes.

18       Q.    And this is excerpts from an index

19       of documents, policies that were provided by

20       Mr. Levy to Cliff Handler, do you see that,

21       the cover letter?

22       A.    Yes.

23       Q.    Have you seen this before?

24       A.    I don't recall this document, no.

25       Q.    Let me ask you to look at the



```
1                        Ibello
2    third page which is FFIC 290.
3         A.    Okay.
4         Q.    Do you have an understanding as to
5    whether that is an accurate -- this is --
6    strike that.
7              This is an index of a policy
8    period 3/15/82 through 3/15/83.
9              Do you have an understanding as to
10   whether that is an accurate listing of those
11   policies and their limits?
12        A.    I have no reason to believe
13   otherwise.
14        Q.    Turn to the next page, same
15   question.  This is for the period 3/15/83 to
16   3/15/84.
17        A.    Same.  Have no reason to believe
18   otherwise.
19        Q.    The next document is marked as
20   Exhibit 12 to your deposition.  It is a
21   letter from Anderson Kill & Olick to David
22   Geronemus.
23              Mr. Geronemus was a mediator that
24   you used in the dispute with ASARCO,
25   correct?
```



Case 1:14-cv-04718-PGG   Document 47-1   Filed 07/06/15   Page 13 of 44

GARY IBELLO                                          April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                        77

```
 1                        Ibello
 2        A.    Yes.
 3        Q.    Were you involved in the mediation
 4   proceedings with Mr. Geronemus?
 5        A.    No.
 6        Q.    Who attended on behalf of the
 7   Fireman's Fund?  Mr. Billeter?
 8        A.    I believe so, yes.
 9        Q.    Did you review reports that came
10   from the Crowell firm regarding those
11   mediations?
12        A.    I believe I would have reviewed
13   some.  Yes.
14        Q.    Did you review any of the
15   mediation briefs that were submitted in the
16   course of the mediation process?
17             MR. SCHWARTZ:  Are you talking
18        about at the time or in preparation
19        for the deposition?
20             MR. KING:  That is a good
21        question.
22   BY MR. KING:
23        Q.    Contemporaneously did you as the
24   mediation proceedings were going on did you
25   review the briefing?
```



```
1                          Ibello
2        A.    I don't recall specifically.
3        Q.    Have you subsequently reviewed the
4   mediation briefs and papers?
5        A.    I have seen some of them, yes.
6        Q.    Let me just ask you to turn to the
7   last page of this particular exhibit.
8              This is a document that was an
9   exhibit to a submission by Anderson Kill who
10  was representing ASARCO in that case,
11  correct?
12       A.    Yes.
13       Q.    This was Exhibit D to one of your
14  mediation briefs.  It is a chart showing the
15  insurance towers provided to ASARCO.
16             Do you see that?
17       A.    Yes.
18       Q.    Do you have any -- do you believe
19  this to be an accurate chart of the coverage
20  afforded to ASARCO for the years 1968
21  through 1984?
22       A.    I don't have any independent
23  knowledge of the accuracy.
24       Q.    But with respect to the last two
25  years, the 1983 and 1984 years, do you
```



```
1                        Ibello
2   believe those to be accurate?
3        A.    They appear to be, yes.
4        Q.    So if we look at the chart with
5   respect to the 1982 to 1983 policy we will
6   see that Fireman's Fund sits on top of that
7   particular tower and it spans from
8   $33 million to $53 million, right?
9        A.    Yes.
10       Q.    So the underlying limits in that
11  year are $33 million comprised of the
12  underlying insurance policies plus the
13  $3 million self-insured retention held by
14  ASARCO, correct?
15       A.    I believe that is correct, yes.
16       Q.    For the second year -- I am sorry,
17  for the 1983 to 1984 year you will see that
18  there are two Fireman's Fund policies.
19            The first one is, spans from
20  $33 million to $53 million and that is the
21  $20 million excess $30 million policy,
22  correct?
23       A.    Yes.
24       Q.    It also sits above the $3 million
25  so a total of $33 million underlying?
```



GARY IBELLO                                    April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                    80

```
 1                        Ibello
 2      A.    Do you want to add up the --
 3      Q.    If I represent to you that it is
 4   $33 million will you accept that?
 5      A.    Sure.
 6      Q.    You can look if you like.
 7      A.    Okay.
 8      Q.    So there is $33 million underlying
 9   that, correct?
10      A.    Yes.
11      Q.    All right.
12            And then if you go up, just above
13   the first Fireman's Fund policy is a Twin
14   City fire policy for $15 million, correct?
15      A.    Yes.
16      Q.    As depicted there and then a
17   Prudential policy of $10 million there,
18   correct?
19      A.    Yes.
20      Q.    And then sitting on top of that is
21   Fireman's Fund's $20 million excess of
22   $75 million policy, correct?
23      A.    Yes.
24      Q.    And plus another $3 million
25   self-insured retention.
```



```
 1                         Ibello
 2              So that policy sits excess of
 3    $78 million in underlying coverage, correct?
 4         A.    Yes.
 5         Q.    And can we agree that that policy
 6    there, that one that is 75 excess of
 7    $20 million which is the policy that gives
 8    rise to the claim in this lawsuit that we
 9    are here for?
10         A.    Yes.
11         Q.    So this is a depiction at least
12    for those last two years of what I referred
13    to as the coverage towers covering ASARCO in
14    those two years, correct?
15         A.    Yes.
16         Q.    Do you have any reason to believe
17    that the rest of the towers as shown there
18    are inaccurate?
19         A.    No.  Although I would point out
20    there is one limit there that seems to be
21    scratched out and a handwritten number
22    written in there.  I don't know what that
23    references.
24         Q.    Where are you looking there?
25         A.    It is in the '78-'79 year.
```



```
 1                        Ibello
 2        Q.    Okay.  Exhibits 13, 14 and 15 are
 3    respectively the 1982 to 1983 Fireman's Fund
 4    policy which is 30 million excess of
 5    $20 million.
 6              The 1983-1984 policy which is --
 7              MR. SCHWARTZ:  You said it
 8    backwards.
 9    BY MR. KING:
10        Q.    Let me restate that.
11              Exhibit 13 is the 1982 to 1983
12    policy, if I am correct.
13              MR. SCHWARTZ:  Off the record.
14              (Discussion off the record)
15    BY MR. KING:
16        Q.    Let's redo it.
17              MR. KING:  Thank you, Steve.
18    BY MR. KING:
19        Q.    Exhibit 13 is the Fireman's Fund
20    1982 to 1983 policy which provides limits of
21    $20 million excess of $30 million, correct?
22        A.    Yes.
23        Q.    Exhibit 14 is Fireman's Fund's
24    policy which provides limits of $20 million
25    excess of $30 million for the period 1983 to
```



Case 1:14-cv-04718-PGG   Document 47-1   Filed 07/06/15   Page 19 of 44

GARY IBELLO                                                    April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                                  83

```
 1                        Ibello
 2    1984; is that correct?
 3        A.    Yes.
 4        Q.    And then Exhibit 15 is Fireman's
 5    Fund's policy which was in effect for the
 6    period 1983 to 1984 which provides coverage
 7    of $20 million excess of $75 million,
 8    correct?
 9        A.    Yes.
10        Q.    Now, other than the limits of
11    liability, underlying insurance limits of
12    liability the premium basis and the schedule
13    of underlying insurance that shows up on the
14    first page of these policies.
15              Do you see that?
16        A.    Yes.
17        Q.    Do you have an understanding as to
18    whether or not they provide -- each one of
19    them is written on the same form?
20        A.    Yes, I believe they are all three
21    written on the same 5902-2-72 form.
22        Q.    And in addition to being written
23    on that form it is correct to say that each
24    one of them has identical endorsements 1
25    through 3, is that right?
```



```
 1                      Ibello
 2       A.    Yes.  I believe that is correct.
 3       Q.    So to the extent I asked you
 4  questions as we proceed in the next few
 5  minutes about the insuring agreements under
 6  these policies I presume that the answers
 7  will be the same with respect to the terms
 8  and conditions, is that fair?
 9       A.    Well, generally, yes.
10       Q.    Let me ask you in the first
11  instance to go to Exhibit 13 which is that
12  first policy which is the 1982 to 1983
13  policy which provides the 20 million excess
14  of $30 million.
15            Do you see there that there is a
16  premium, annual minimum premium of $60,000?
17       A.    Yes.
18       Q.    That is the premium that was paid
19  to Fireman's Fund for that policy, correct?
20       A.    I believe so, yes.
21       Q.    Okay.  And then if we go down to
22  item 7 which is the schedule of underlying
23  insurance that lists the underlying policies
24  for this particular policy that would have
25  to be exhausted prior to this policy having
```



```
 1                    Ibello
 2   any liability, correct or indemnity
 3   obligation?
 4        A.    Yes.
 5        Q.    And if we look at Exhibit 14, that
 6   is the same policy for the following year at
 7   the $20 million excess $30 million level,
 8   correct?
 9        A.    Yes.
10        Q.    Okay.  And here too you will see
11   there is a premium of $60,000, correct?
12        A.    Yes.
13        Q.    And then we will see the schedule
14   of underlying insurance which is the same
15   three policies, is that right?
16        A.    Yes.  It is the same three
17   insurance companies' limits.  I don't know
18   about the specific policies.
19        Q.    Fair comment.
20              So the same companies and same
21   underlying limits in each of those two
22   policies, correct?
23        A.    Yes.
24        Q.    If we look at Exhibit 15 which is
25   the higher level policy for the 1983 to 1984
```

GARY IBELLO
FIREMAN'S FUND vs. ONEBEACON INSURANCE

April 01, 2015
86

```
 1                      Ibello
 2   year that one is $20 million excess of
 3   $75 million, correct?
 4        A.    Yes.
 5        Q.    And it states there the premium is
 6   $30,000, correct?
 7        A.    Yes.
 8        Q.    Do you have an understanding as to
 9   why the premium for this higher level policy
10   at Exhibit 15 is less than and in fact half
11   of the policy premium for the Exhibits 14
12   and 13?
13        A.    I don't have any specific
14   knowledge but just in general it attaches at
15   a higher point so they probably charge less
16   premium.
17        Q.    By that you mean that there is
18   a -- it is further from liability by virtue
19   of there being more underlying limits?
20        A.    The underlying limits of liability
21   are greater in this policy than the other
22   two.
23        Q.    Would you agree with me that it is
24   about -- that last policy, Exhibit 15 is
25   more remote from the risk by virtue of
```



```
 1                    Ibello
 2    having further underlying or greater
 3    underlying limits?
 4             MR. SCHWARTZ:  Objection to
 5        form.
 6             THE WITNESS:  I am not sure
 7        about the risk part but it attaches at
 8        a higher level.  It attaches at a
 9        higher level.
10    BY MR. KING:
11        Q.   Why would an underwriter take
12    $30,000 for one -- for the policy attaching
13    excess of $75 million versus $60 million for
14    the policy attaching excess of $30 million?
15             MR. SCHWARTZ:  Objection to
16        form.
17             THE WITNESS:  As I stated
18        earlier I am not an underwriter but my
19        general understanding is since it
20        attaches at a higher level the premium
21        charge for that is less.
22    BY MR. KING:
23        Q.   And why?  But why?
24        A.   Because it attaches at a higher
25    level.
```



```
                         Ibello
 1
 2       Q.    What does that mean?
 3       A.    That you have to have 75 million
 4   in losses before the policy is triggered
 5   versus 30 million.
 6       Q.    In this case it is actually more
 7   like $78 million because of the
 8   self-reinsured retention; correct?
 9       A.    78 versus 33, yes.
10       Q.    I am going to direct you to --
11   let's use Exhibit 15 but we have agreed that
12   the insuring agreements are identical in all
13   of these, correct?
14       A.    Yes.
15       Q.    So if I ask a question about 15
16   relating to the terms and conditions it will
17   be the same answers for Exhibit 14 and 13,
18   correct?
19       A.    Yes.  But could I suggest you use
20   the first one because it is a much clearer
21   copy.
22       Q.    Okay.  That is fair enough.  I
23   will do that.
24             Let me ask you, before I go on to
25   that with respect to Exhibit 15 which is the
```



1                        Svetska
2    claims report in your reference.
3        Q.    Well, let me ask you another
4    question.  Where would this information have
5    come from?
6        A.    This information would have come
7    from the claim file.
8        Q.    So you would have just been
9    adopting what you found in the claim file
10   and reporting what you found in the claim
11   file?
12       A.    The main source of information for
13   this particular report that I wrote appears
14   to be the March 26, 2012 closing file report
15   asbestos DRA.
16       Q.    What is that?
17       A.    That would be a claims department
18   narrative report.
19       Q.    Okay.  And you would have relied
20   upon that document for purposes of preparing
21   this report, correct?
22       A.    In part, yes.
23       Q.    What else -- what did you generate
24   specifically on this report that wasn't from
25   the claims department information in the

```
 1                        Ibello
 2        Q.      Let me see if I have that for you.
 3        A.      The schedule shows American Home.
 4        Q.      Let me ask you to just quickly
 5   look at Exhibit 16.
 6                Does that appear to be the
 7   underlying policy to which this follows
 8   form?
 9        A.      It appears to be, yes.
10        Q.      Now, there is an exception --
11   going back to the clause we just looked at
12   there is an exception to the following form
13   with respect to "warranties, terms,
14   conditions or exclusions relating to
15   premium, the obligation to investigate and
16   defend the amount and limits of liability in
17   any renewal agreement."
18                Do you see that?
19        A.      Yes.
20        Q.      So that means if I am correct that
21   there are separate terms and conditions of
22   this policy that stand alone and separate
23   from the underlying policies, correct?
24        A.      Yes.
25        Q.      Now, we have talked this morning
```



```
 1                     Ibello
 2   quite a bit about exhaustion.  You said that
 3   there were contractual provisions for
 4   exhaustion, correct?
 5        A.    Yes.
 6        Q.    Do different policies contain
 7   different provisions for providing for
 8   exhaustion?
 9        A.    Yes.
10        Q.    The language varies, correct,
11   across the industry?
12        A.    Yes.
13        Q.    Can you show me what the
14   provisions within this policy are that
15   identify the exhaustion requirements under
16   the policy?
17        A.    This is one of those that wasn't
18   stapled.
19        Q.    We have a stapler here.
20        A.    Okay.  The limits of liability
21   section, I think this basically addresses
22   the underlying insurance issues.
23        Q.    Is this something that you viewed
24   in connection with your preparing for the
25   deposition today?
```



GARY IBELLO                                    April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                      98

```
 1                      Ibello
 2       A.     I reviewed the policy, yes.
 3       Q.     Did you specifically review the
 4   limits of liability provision?
 5       A.     I believe so, yes.
 6              In this particular policy there is
 7   actually an endorsement that replaces this
 8   language so the limits of liability is in a
 9   separate endorsement.
10       Q.     Right.  That was my next question.
11              So we see that -- if you go back
12   to and we are looking at Exhibit 14,
13   correct, we are all looking at the same
14   document?
15       A.     Yes.
16       Q.     Under insuring agreements item
17   number 2 there is a provision that refers to
18   limit of liability, correct?
19       A.     Yes.
20       Q.     And if you turn to endorsement
21   number 1 you will see there is an
22   endorsement that is -- specifically changes
23   the limit of liability provision or at least
24   addresses the limit of liability provision,
25   correct?
```



GARY IBELLO                                           April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                           99

```
 1                        Ibello
 2        A.     Yes.
 3        Q.     That is the same provision in each
 4   of the three policies we are talking about
 5   here today, correct?
 6        A.     I would have to go back and look.
 7        Q.     Why don't you do that.
 8        A.     Yes.
 9        Q.     It starts off, "Under limit of
10   liability.  The company shall be liable only
11   for the limit of liability stated in item 3
12   of the declarations in excess of the limit
13   or limits of liability of the applicable
14   underlying insurance policy or policies all
15   as stated in the declarations of this
16   policy."  Right.
17               Do you see that?
18        A.     Yes.
19        Q.     That is referring back to the
20   block on the front page of the policy
21   showing in this case the $20 million limits,
22   correct?
23        A.     Yes.
24        Q.     And it states, specifically that
25   it has to be excess -- that limit of
```

Ibello

2  liability only applies if it is excess of

3  the limit or limits of liability of the

4  underlying insurance policies, right?

5      A.     Correct.

6      Q.     Those are the policies that we

7  find either specifically listed or

8  referenced in item C of that front page,

9  correct, I am sorry, item 7?

10     A.     Yes.

11     Q.     The clause regarding limit of

12 liability goes on to state, "The limit of

13 the liability stated in the declarations as

14 applicable to each occurrence shall be the

15 total limit of the company's liability for

16 all damages sustained as the result of any

17 one occurrence provided however in the event

18 of reduction or exhaustion of the applicable

19 aggregate limit or limits of liability under

20 said underlying policy or policies solely by

21 reason of losses paid thereunder on a count

22 of occurrences during this policy.  This

23 policy shall in the event of reduction apply

24 as excess of the reduced limit of liability

25 thereunder."



```
 1                        Ibello
 2              What does that mean?
 3         A.    That basically means in a
 4    situation where you have claims that are
 5    subject to aggregate limits, that this
 6    policy attaches once the -- that aggregate
 7    limit has been exhausted by claims that are
 8    subject to the aggregate.
 9         Q.    Do the policies underlying the
10    three policies we are talking about here all
11    have aggregate limits?
12         A.    I haven't reviewed them but I
13    would assume that they had aggregate limits,
14    yes.
15         Q.    So this policy doesn't attach
16    until there is payment of those aggregate
17    limits, correct?
18              MR. SCHWARTZ:   Objection to
19         form.
20              THE WITNESS:   Well, payment of
21         losses.
22    BY MR. KING:
23         Q.    Losses paid thereunder.
24              Now let me ask you about some
25    specific words here.
```



```
 1                        Ibello
 2            It says, "In the event of
 3     reduction or exhaustion of the applicable
 4     aggregate limit or limits of liability under
 5     said underlying policy or policies solely by
 6     reason of losses paid thereunder."
 7            Do you see that phrase?  "Solely
 8     by reason of losses paid thereunder."
 9     A.    Yes.
10     Q.    What does that phrase mean?
11            MR. SCHWARTZ:  You might want to
12        read the whole phrase.
13            THE WITNESS:  Well, it says that
14        the -- if the aggregate limit is
15        reduced by payment of losses that are
16        attributable to occurrences during
17        this policy period then this policy
18        will apply excess of reduced limit
19        based on the amount of the aggregate
20        limit that has -- under which losses
21        have been paid.
22     BY MR. KING:
23        Q.    We agree that has to be exhaustion
24     of the underlying policies, right,
25     Mr. Ibello?
```



GARY IBELLO                                           April 01, 2015
FIREMAN'S FUND vs. ONEBEACON INSURANCE                          103

```
 1                        Ibello
 2        A.    Yes.
 3        Q.    Here is my question.  Doesn't the
 4   term "solely" -- strike that.
 5             Doesn't the phrase "solely by
 6   reason of losses paid thereunder" mean
 7   losses actually paid by the underlying
 8   insurers under their policies?
 9             MR. SCHWARTZ:  Objection.
10        Argumentative and also you are not
11        reading the whole phrasing, I don't
12        think.
13             THE WITNESS:  It doesn't say
14        that, no.
15   BY MR. KING:
16        Q.    What does the term "solely by
17   reasons of losses paid thereunder" mean?
18             MR. SCHWARTZ:  Same objection.
19             THE WITNESS:  It means that the
20        aggregate limit is reduced or the --
21        that -- I would call it the attachment
22        point for aggregate claims is reduced
23        under this policy by the payment of
24        claims resulting from occurrences that
25        trigger this policy period.
```

```
 1                      Ibello
 2   BY MR. KING:
 3        Q.     There is no requirement -- strike
 4     that.
 5               What does the word -- what does
 6     the term "thereunder" refer to in this
 7     phrase?
 8        A.     I would say it refers to losses
 9     paid under the aggregate limit.
10        Q.     Does it not refer back to the
11     policies, the underlying policies, sir?
12        A.     No, I don't believe so.
13        Q.     In the -- let me read it again,
14     "In the event of reduction or exhaustion of
15     the applicable aggregate limit or limits of
16     liability under said underlying policy or
17     policies solely by reason of losses paid
18     thereunder," your position is that that term
19     "thereunder" does not refer back to payment
20     under the underlying policies, is that
21     right?
22               MR. SCHWARTZ:  Asked and
23          answered.
24               THE WITNESS:  I say it says
25          "losses paid."  It does not
```

```
 1                    Ibello
 2      specifically say who had to pay them.
 3   BY MR. KING:
 4        Q.    What does "thereunder" mean then,
 5   does it have a meaning?
 6        A.    I am interpreting "thereunder" to
 7   be referring back to losses that are paid
 8   that apply to the aggregate limit.
 9        Q.    On what basis is that your
10   interpretation?
11        A.    The construction of the sentence.
12        Q.    Okay.  Do you know if at the point
13   in time when this claim was under review for
14   purposes of coverage to ASARCO whether
15   anybody analyzed the meaning of this
16   particular clause?
17        A.    I don't know specifically but --
18        Q.    Have you ever seen any analysis of
19   that clause in the underlying file?
20        A.    Not that I recall.
21        Q.    Do you have a sense -- strike
22   that.
23              Do you have an understanding as to
24   what law you believe would govern the
25   interpretation of that clause in the ASARCO
```



GARY IBELLO
FIREMAN'S FUND vs. ONEBEACON INSURANCE

April 01, 2015
106

```
 1                    Ibello

 2  matter?

 3      A.    There was a debate between Texas

 4  and New York law applying.

 5      Q.    Was there a holding in a case with

 6  respect to applicable law?

 7      A.    The judge ruled that Texas law

 8  should apply.

 9      Q.    So that was the law of the case as

10  of the time of the resolution of the matter,

11  correct?

12      A.    "Law of the case," I am not sure

13  what you mean by that but that was the

14  ruling by the judge that would have been

15  subject to appeal.

16      Q.    What was -- you said there was a

17  debate.  What law did Fireman's Fund

18  maintain applied to the policies?

19      A.    New York.

20      Q.    Do you know if anybody has ever

21  analyzed the meaning of that phrase on

22  behalf of Fireman's Fund under New York law?

23      A.    I don't have a specific

24  recollection.

25      Q.    You are the designee on the part
```



```
 1                      Ibello
 2     of the company with respect to the terms and
 3     conditions of this policy, right?
 4          A.    That's right.
 5          Q.    But you have no knowledge of that?
 6               MR. SCHWARTZ:  Well, objection
 7          to form.
 8               THE WITNESS:  I have no
 9          knowledge of a specific written
10          opinion from a specific counsel on
11          this language.  I can --
12     BY MR. KING:
13          Q.    Have you ever seen any opinions
14       within Fireman's Fund relating to the
15       interpretation of that clause, legal
16       opinions?
17               MR. SCHWARTZ:  Is your question
18          directed generally or --
19               MR. KING:  Generally.
20               MR. SCHWARTZ:  So on any case,
21          not limited to ASARCO?
22               MR. KING:  Right.
23               THE WITNESS:  Yes, I believe we
24          have had this language interpreted in
25          handling claims under this policy
```



```
 1                       Ibello
 2       Q.    Okay.  Do you believe this is
 3   unambiguous?
 4       A.    Yes.
 5       Q.    You believe it is unambiguous in
 6   saying -- in the interpretation you
 7   afforded, correct?
 8       A.    Yes.
 9       Q.    Okay.  Let me ask you this
10   question.  We talked earlier about one of
11   your affirmative defenses that was pled in
12   the underlying case and that was with
13   respect to drop down.  Do you remember that?
14       A.    Yes.
15       Q.    Where do you find the drop down
16   provisions in this particular policy?
17       A.    I would say it is in the
18   maintenance of underlying insurance.
19       Q.    How about the limit of liability
20   provision, does that affect the drop down
21   obligation or lack thereof?
22       A.    I think they are separate
23   provisions.
24       Q.    Show me in the policy where the --
25   where you gain an understanding of what the
```



```
 1                      Ibello
 2      Fireman's Fund's obligations are to drop
 3      down or not in the case of bankruptcy.
 4               MR. SCHWARTZ:  Do you want to
 5           staple this?  It may be easier.
 6               THE WITNESS:  Yes.  Keep this
 7           together.
 8               I do not see a provision in this
 9           policy that makes specific reference
10           to the insured being bankrupt.
11    BY MR. KING:
12           Q.    So when you said earlier that you
13      would look to the policy to determine your
14      drop down obligations or lack thereof under
15      the Fireman's Fund policy where would you
16      look?
17           A.    The limit of liability section.
18           Q.    So the drop down obligations --
19      strike that.
20               You stated earlier that or it was
21      pled that there was no drop down obligation
22      under the Fireman's Fund policy, correct?
23           A.    Yes.
24           Q.    Where do you find that in the
25      limit of liability provision?
```



GARY IBELLO
FIREMAN'S FUND vs. ONEBEACON INSURANCE

April 01, 2015
114

```
 1                        Ibello
 2        A.     It is in the language that
 3   basically says that policies excess of a
 4   certain limit and until there are losses
 5   that have been paid and attributable to that
 6   policy year that reach that limit we don't
 7   have to pay, whether that is because of the
 8   insurer going insolvent, the carrier going
 9   insolvent as long as -- our position is as
10   long as there is loss that has been paid
11   attributable to that year sufficient to
12   exhaust the limit then this policy can be
13   triggered.
14        Q.     Now, are you aware of Fireman's
15   Fund ever relying upon the language of
16   solely by reason of losses paid thereunder
17   to establish that it did not have a drop
18   down obligation in bankruptcy by virtue of
19   the fact there has to be actual payment
20   under a policy?
21             MR. SCHWARTZ:   Objection to
22        form.
23             THE WITNESS:   I am not sure
24        under this language.
25
```

```
 1                       Ibello
 2    BY MR. KING:
 3         Q.    Are you aware that type of
 4    argument being made under other limit of
 5    liability provisions?
 6               MR. SCHWARTZ:   Objection to
 7         form.
 8    BY MR. KING:
 9         Q.    Fireman's Fund limits of liability
10    provisions?
11         A.    I can't say specifically Fireman's
12    Fund.
13               I am aware of cases that have made
14    that argument based on language that was
15    different than these policies.
16         Q.    Have you reviewed those cases in
17    connection with your preparation for this
18    deposition?
19         A.    No.
20         Q.    Do you know if anybody has
21    analyzed the limits of liability provision
22    in connection with the reinsurance claim
23    against OneBeacon in this case?
24         A.    No.
25         Q.    You don't know or it has not been
```



                            Ibello

 1

 2    done other than advice from counsel?

 3        A.    I don't know.

 4        Q.    Did you ever speak to Mr. Svetska

 5    about handling the reinsurance claim?

 6        A.    In what context?

 7        Q.    In the context of the denial by

 8    OneBeacon.

 9        A.    I have had general discussions but

10    nothing specific.

11        Q.    Have you ever discussed the limit

12    of liability provision with Mr. Svetska in

13    connection with OneBeacon's denial of the

14    claim?

15        A.    No.

16        Q.    Have you ever discussed the limit

17    of liability provision with anyone else at

18    Fireman's Fund other than counsel in

19    connection with OneBeacon's denial of the

20    claim?

21        A.    No.

22        Q.    One more set of questions and then

23    we will break for lunch.  Then I will get

24    some more documents.

25        A.    Those are all for Mr. Svetska.



```
 1                       Ibello
 2      on 9/17/08  was marked Defendant's Exhibit
 3      28 for identification)
 4   BY MR. KING:
 5         Q.    Exhibit 28, Mr. Ibello, is a
 6      9/17/08 update on asbestos presumably
 7      prepared by Mr. Kane at this point in time;
 8      is that right?
 9         A.    Yes.  I believe so.
10         Q.    At this point it is showing
11      reserves spread through three different
12      policy periods, correct?
13         A.    That is correct, yes.
14         Q.    Who made the determination to
15      allocate to the three different policies?
16         A.    Well, basically in this case where
17      we are evaluating sort of the ground up
18      exposure and you are in a bankruptcy context
19      so instead of just negotiating coverage in
20      place we handle claims as they come in you
21      are including future, an estimate of future
22      claims, number one.
23               And then number two, you have
24      various coverage arguments that were being
25      litigated so we use this type of modeling in
```



```
 1                        Ibello
 2      these cases to estimate our liability like
 3      we talked about in the prior exhibit and
 4      the --
 5           Q.    Sorry.  Go ahead.
 6           A.    And so part of that modeling as we
 7      saw it showed that an average or an exposure
 8      of $21 million and that $21 million is an
 9      average of different scenarios a number of
10      which expose all three policies so our
11      practice is to reserve the policies
12      consistent with how the exposure is
13      developed in our modeling.
14           Q.    When you say your "practice," you
15      mean Fireman's Fund's practice generally?
16           A.    Yes.
17           Q.    That is the -- is that the process
18      it always uses in terms of setting reserves?
19           A.    For this type of case I would say,
20      yes.
21           Q.    Let me ask you this.  When you
22      used the term "reserves," explain to me what
23      that means and what reserves are.
24           A.    Well, reserves are basically your
25      estimation of what you will ultimately pay
```

