**47**

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------------

5    FIREMAN'S FUND INSURANCE COMPANY,

6                   Plaintiff,
                              Civil Action No.
7       -against-                14 CV 4718

8    ONEBEACON INSURANCE COMPANY as
     successor-in-interest to GENERAL ACCIDENT
9    INSURANCE COMPANY OF AMERICA,

10                  Defendant.

11   ---------------------------------------

12           DEPOSITION OF MADELYN FAGGELLA, a

13   Witness herein, taken by Defendant, pursuant

14   to Notice, at the offices of Esquire

15   Deposition Solutions, 1380 Broadway, New

16   York,  New York, on Friday, April 10, 2015,

17   at 9:57 a.m., before DEBRA STEVENS, a

18   Certified Realtime and Registered

19   Professional Reporter and Notary Public

20   within and for the State of New York.

21

22

23

24

25



1

2       Whereupon,

3          M A D E L Y N   F A G G E L L A,

4   having been first duly sworn/affirmed, was

5   examined and testified as follows:

6   EXAMINATION BY

7   MR. KING:

8       Q.   Ms. Faggella, my name is Mitchell

9   King and I represent OneBeacon in this

10  litigation between OneBeacon and Fireman's

11  Fund.

12          I take it you are designated as the

13  witness on behalf of Fireman's Fund with

14  respect to its risk exposure analysis and

15  reserving.  Is that correct?

16      A.   Correct.

17      Q.   Have you been deposed before?

18      A.   Yes.

19      Q.   How many times have you been

20  deposed?

21      A.   Twice.

22      Q.   In what sorts of actions have you

23  been deposed?

24      A.   The first one was related to an

25  issue of pricing a coverage in personal auto.



```
 1                    M. Faggella
 2        Q.   I think you are aware we are here
 3   in a lawsuit relating to the ASARCO
 4   litigation.  Can you tell me when you first
 5   became involved in the ASARCO litigation that
 6   gave rise to this particular dispute between
 7   Fireman's Fund and OneBeacon?
 8        A.   I believe it was in 2008.
 9        Q.   What was your role and how did you
10   become involved?
11        A.   As part of the support of the
12   run-off I work on the asbestos and
13   environmental, and so if there is a specific
14   case that Claims is working on that they need
15   actuarial support for, then they will get me
16   involved in that case.  And so my role would
17   have been to help build the exposure model
18   that would determine what our projection of
19   the liabilities on the account would be to
20   the Fireman's Fund.
21        Q.   Who asked you to get involved in
22   that process?
23        A.   I believe it would have been Eric
24   Billeter.
25        Q.   Who was Mr. Billeter or who is
```



```
 1                    M.  Faggella
 2    Mr. Billeter?
 3         A.   He is one of the claims managers  in
 4    the asbestos unit.
 5         Q.   Who else was involved in that
 6    process starting with 2008?  And if it
 7    evolved over time you can try to lay that out
 8    for me as well.
 9              MR. SCHWARTZ:  Which process?
10              MR. KING:  The exposure model
11    process, the building of the exposure model.
12         A.   The process generally starts by an
13    explan -- like we have a model in the
14    actuarial department that would be used to
15    develop the ground-up loss for an account.
16    So we would use that model to develop the
17    ground-up loss and then we would work with
18    Claims and counsel, both internal and
19    external generally, to take the model and put
20    into it the other assumptions we need in
21    terms of understanding any coverage issues or
22    allocation that we want to build as the next
23    step in the model after you have the ground
24    up.
25              The next step is to take that
```



```
 1                    M. Faggella
 2    ground up and allocate it to the Fireman's
 3    Fund policies.  And so I would work with
 4    Claims and counsel to understand how to
 5    interpret what needs to be done in the model
 6    to build the allocation methodology.
 7         Q.   Okay.  Let's see if we can break
 8    that down a little bit.
 9         A.   Okay.
10         Q.   It's a lot of information.
11              So, I take it from your response
12    that the actuarial department actually has a
13    model for building the ground-up exposure.
14    Is that fair?
15         A.   Correct.
16         Q.   Let me start at even a more basic
17    question.  When we talk about an exposure
18    model, what do you mean when you use that
19    term?
20         A.   It is the model that we would use
21    to project what we think the liability is to
22    Fireman's Fund for the particular account
23    that we are analyzing.
24         Q.   And the word "exposure" means the
25    potential liabilities?  Is that what that
```



```
 1                    M.  Faggella
 2    means?
 3         A.    Correct.
 4         Q.    So the actuarial department has a
 5    tool in place or model in place to build a
 6    ground-up exposure.  Is that fair?
 7         A.    Yes.
 8         Q.    And you gather whatever data that
 9    you need to input into that to determine the
10    ground-up.
11              When you talk about ground-up
12    exposure, what does that mean?
13         A.    The ground-up exposure is our
14    estimate of what we think the ultimate
15    liability for asbestos is going to be for the
16    account.  And that would be their total
17    ultimate liability.
18         Q.    "Their" being --
19         A.    The account that we are analyzing.
20    So in this case it would be ASARCO.  So that
21    is why it is ground up, because it is the
22    full view of our projection of the account's
23    liability, not Fireman's Fund.  First we
24    develop the full ground-up, what is our
25    projection of the liability.
```



```
 1                    M. Faggella
 2        Q.   So let me just be clear.  I am
 3   sorry to dig too far into this, but
 4   "ground-up" means what?  All liabilities to
 5   all insurers?
 6        A.   Yes.
 7        Q.   Or all liabilities to ASARCO?
 8        A.   It is the liability that we believe
 9   will ultimately be ASARCO's due to their
10   asbestos exposure.
11        Q.   Is that sometimes referred to as
12   "size of the problem"?
13        A.   Yes.
14        Q.   Now, the model that you use to
15   build this ground-up exposure, where does
16   that come from?  What is that model?
17        A.   It is a -- basically a frequency
18   severity model.  So, the main components of
19   projecting this ground-up loss or size of the
20   problem is a projection of the future filings
21   that will be made against the account.  And
22   that's the frequency component.
23             And then also the severity or how
24   much per claim is projected to be paid on
25   these future accounts.  And...
```

```
 1                     M. Faggella
 2        Q.   Well, let me ask you this.  Is
 3   there anything proprietary about the
 4   modelling that you build --
 5        A.   Yes.
 6        Q.   -- for the ground-up analysis?
 7        A.   Yes.
 8        Q.   What is the proprietary component
 9   of that?
10        A.   From my standpoint, the inputs
11   and -- I mean, I would say the model itself.
12   I mean, we have a proprietary relationship
13   with our consultant, and our model is
14   proprietary to our company.
15        Q.   Is that information that -- there
16   has been testimony in this matter that there
17   is certain information that is not shown to
18   the reinsurers.  Is that information that is
19   not shown to the reinsurers?
20        A.   We don't release our models.
21        Q.   Now, does that apply just to the
22   ground-up analysis that you -- "you" being
23   Fireman's Fund conducts, or does it apply to
24   other elements of the analysis, the exposure
25   analysis that comes after the ground-up
```



```
 1                    M. Faggella

 2   piece?

 3        A.    So can I just state that from a

 4   reinsurance perspective and auditing, I am

 5   not actually involved in that.  So I do not

 6   know if a reinsurer comes into the office --

 7   I am pretty sure we never send models,

 8   including the whole analysis, which gets to

 9   the Fireman's Fund liability out.

10             I don't know that it's not -- I am

11   not involved in that process to know.  But

12   yes, the allocation is proprietary as well.

13        Q.    There appears to be two components

14   to the process.  One is the ground-up

15   allocation -- the ground-up determination of

16   the size of the problem, and then there is a

17   second piece which is how Fireman's Fund

18   further analyzes the issues in the case and

19   projects the ultimate liability and spread of

20   the potential losses to its policies.  Right?

21        A.    Correct.

22        Q.    Now, I know from the documents that

23   you use a so-called decision tree analysis.

24   Correct?

25        A.    Yes.
```



MADELYN FAGGELLA                                          April 10, 2015
FIREMAN'S FUND INSURANCE vs. ONEBEACON                          26

```
 1                    M. Faggella
 2   have a sense of whether you want to press
 3   forward or not, then we can confer and figure
 4   out if there is a way.
 5            MR. KING:  Perhaps at lunch time
 6   I'll see if I want to press that further.
 7   Okay?
 8            MR. SCHWARTZ:  Yes.
 9        Q.   So I want to stay general.  So we
10   have this ground-up analysis piece of the
11   process and then we have this allocation to
12   the policies piece of the process.  Correct?
13        A.   Correct.
14        Q.   Is it fair to say that the overall
15   analysis of the allocation to the policies
16   using that decision tree methodology
17   represents a hybrid of a whole variety of
18   potential outcomes in the case?
19        A.   Can you restate that question?
20            MR. KING:  Would you repeat that,
21   please?
22            (Question read.)
23        A.   The -- I believe, if I understand
24   what you are saying, that it is correct if
25   what you are saying is the decision tree
```



```
 1                     M. Faggella
 2    itself is looking at the various issues in
 3    the case because there are certain things
 4    such as coverage issues that may not be
 5    decided.  And so, what you are looking at is
 6    what are those coverage issues and what is
 7    associated probabilities with them.
 8              For each of the issues, you are
 9    developing a scenario from the model to match
10    the issue.  And then when you are saying the
11    hybrid, I believe what you may mean is you
12    are going to assign a probability to each
13    scenario and with that you are going to
14    multiply the scenarios out, combine that
15    probability to get a probability-weighted
16    outcome.
17         Q.   A weighted average of some sort?
18         A.   Yes.
19         Q.   And what is a weighted average?
20         A.   Each -- you take the scenario
21    outcome times its probability and you sum
22    that up across all of them to get what is the
23    weighted average.
24         Q.   The scenario outcome is a dollar
25    figure?
```



```
 1                        M. Faggella
 2        A.    Yes.
 3        Q.    Now, once you have come up with an
 4   exposure assessment and made a recommendation
 5   to senior management, if they accept it do
 6   the reserves get posted in the manner that
 7   you have requested assuming it's been
 8   approved?
 9        A.    I would say yes.  I do not post
10   reserves.  There is two components to a
11   reserve potentially.  In this case what we
12   are doing is we are looking at a specific
13   account and determining what we believe the
14   outcome is and are trying to settle the
15   account.  And so from the exposure modelling,
16   we get an allocation to the policies and the
17   claims adjustors would have used that
18   allocation to post reserves, case reserves
19   for the account.
20        Q.    To your understanding would those
21   become the statutory reserves for each of
22   those respective policies?
23              MR. SCHWARTZ:  Objection to the
24   form.
25        A.    Your question to me is a little
```



```
 1                    M. Faggella
 2   name who the people were who were involved or
 3   heavily involved in that process?
 4            MR. SCHWARTZ:  For ASARCO?
 5            MR. KING:  For ASARCO.
 6       A.   Gary Iabello, Dan Kane would be the
 7   internal Fireman's Fund people.
 8       Q.   Along with Mr. Billeter?
 9       A.   Along with Mr. Billeter.  Outside
10   counsel that I would have worked or been in
11   meetings with would have been Cliff Hendler
12   and Patricia Connally.  And I believe Ryan
13   Russell, internal counsel, would have also
14   participated in meetings.
15       Q.   Mr. Russell is internal Fireman's
16   Fund counsel?
17       A.   Yes.  And I am not sure if Ryan --
18   but I think he was involved.
19       Q.   So explain to me, in terms of
20   process, what the respective roles were of
21   the claims people and the outside counsel.
22       A.   The claims people are the internal
23   company people who are actually handling the
24   claim and know the most about the case.  And
25   Eric's area specializes in the DJ's.
```



```
 1                    M. Faggella
 2          So, they would be the ones who are
 3   working to understand the coverage issues.
 4   And they would work with outside counsel to,
 5   you know, identify the coverage issues,
 6   understand the coverage issues, follow the
 7   case through in terms of the coverage issues
 8   and give the inputs that would be needed for
 9   modelling in terms of what the probabilities
10   are associated with each of those issues.
11        Q.   We'll see as we come to some of the
12   documents in a few minutes that there are
13   various probabilities of outcome in
14   percentages.  Would that information have
15   come from counsel?
16        A.   I think counsel and claims may have
17   some input as well, but I would get that
18   information from them, yes.
19        Q.   So you would use the information
20   they provided you --
21        A.   Yes.
22        Q.   -- to populate the model, the data
23   in the model?
24        A.   Correct.
25        Q.   What was your specific role in the
```



```
 1                    M. Faggella
 2   process so I can see how it all fits
 3   together?
 4        A.   So, I would be the one that would
 5   be interpreting the information of the model
 6   into the actual model.  So, building the
 7   model itself and taking the probabilities and
 8   the outcomes from the model and doing the
 9   math to get to the weighted outcome.
10        Q.   When you say you do the math, are
11   you putting things into spreadsheets, or are
12   you actually doing more than that?
13        A.   No.  It's an Excel-based model.
14        Q.   So you populate a model with
15   information and you tell them sort of what
16   information you need to build the elements of
17   the model that you are working on?
18        A.    Correct.  They are telling me what
19   the coverage issues are, and I am going to
20   take those and build the model around them
21   and then discuss with them to make sure that
22   I am interpreting what they are asking me to
23   do correctly in the model.
24        Q.   This is Defendant's 23.  This is a
25   document previously marked as Defendant's
```



```
 1                    M.  Faggella
 2   these to be the three Fireman's Fund policies
 3   that were at issue in the ASARCO litigation,
 4   the asbestos litigation?
 5        A.   Yes.
 6        Q.   Turn to page 10, please.
 7             I am sorry.  Let's turn back to
 8   page 9, please.  It's captioned "FFIC's Key
 9   Coverage Issues."
10             You testified earlier that the
11   attorneys and claims people would assess
12   coverage issues and give you a percentage
13   likelihood of certain things happening in
14   connection with coverage issues that were in
15   the case.  Is this a listing of the types of
16   issues that were ultimately applied to the
17   analysis?
18        A.   Yes.
19        Q.   Let me ask to you turn to the next
20   page, which is 10.  The second to last bullet
21   point there is captioned "Exhaustion."  "Can
22   ASARCO demonstrate exhaustion of all
23   underlying insurance."
24             Do you see that?
25        A.   Yes.
```



```
 1                    M. Faggella
 2         Q.   Do you understand what that means?
 3         A.    It is a question as to whether
 4    policies underlying higher layers, as our
 5    policies are, have exhausted.
 6         Q.   By exhausted, does that mean pay
 7    the limits?
 8         A.   Yes, I think.
 9         Q.   Did you ever look at -- in the
10    course of your work on this material, this
11    analysis, did you ever look at the Fireman's
12    Fund policy wordings, the actual policies?
13         A.   Me, personally?
14         Q.   Yes.
15         A.   No.
16         Q.   So you never reviewed the terms and
17    conditions of the policies or anything like
18    that?
19         A.   No.
20         Q.   You relied on counsel for
21    purposes of determining what --
22         A.   Yes.
23              MR. KING:  Strike that.
24              MR. SCHWARTZ:  You should let him
25    finish the question before you answer.
```



```
 1                        M.  Faggella
 2        A.    Yes.
 3        Q.    Can you tell me what this is,
 4   please?
 5        A.    This is a page that displays how
 6   the final settlement that was reached with
 7   ASARCO was allocated to the policies, and
 8   that allocation follows what we have done in
 9   our exposure analysis that is on page 58.
10              And in this exhibit here a scenario
11   was selected that was considered to be a
12   likely outcome, and then followed the
13   weighting that we gave to the various size of
14   the problem, so the 482 at 70 percent and the
15   billion at 30 percent.
16        Q.    Let's go back.  Slow down because
17   now you are into some heavy sledding here.
18        A.    Heavy what?
19        Q.    Heavy sledding.  It's a northern
20   term.  You propel through snow on blades.
21   Sledding.
22        A.    Okay.
23              MR. SCHWARTZ:  Not often done in
24   San Francisco.
25              MR. KING:  Sorry to be parochial.
```



MADELYN FAGGELLA                                    April 10, 2015
FIREMAN'S FUND INSURANCE vs.  ONEBEACON                      128

```
 1                    M. Faggella
 2   I apologize.
 3              THE WITNESS:  I think you are
 4   telling me I was going through it fast maybe.
 5              MR. KING:  You got it.
 6        Q.    Let me back up.  Let's stop a
 7   moment but I want to recap a few things.
 8   Let's go back to the page 58 you were just
 9   talking about.  This is modelled off of an
10   assumption that the payout would be how much
11   money?  That the total payout would be how
12   much?
13        A.    The total payout of who?
14        Q.    Under your policies.  The total
15   payment under your policies is modelled at
16   page 58, right?
17        A.    Our estimated payout.  Yes.
18        Q.    So if we were to look at the model
19   that is built off the $482 million and we
20   look at the bottom, the weighted total, we
21   come to 19.9, 19.9, 16.8?
22        A.    Correct.
23        Q.    For a total of 56.6.  So that is
24   modelled off of that much money, which
25   includes a payment for defense cost.
```



MADELYN FAGGELLA                                    April 10, 2015
FIREMAN'S FUND INSURANCE vs. ONEBEACON                       129

```
 1                    M. Faggella
 2   Correct?
 3        A.    Correct.
 4        Q.    And that is on a nominal basis?
 5        A.    Correct.
 6        Q.    Then if you go to the right you
 7   have got the present value of that?
 8        A.    Correct.
 9        Q.    If you go down to the next one, we
10   have the same modelling done on a weighted
11   average basis but using a bigger number, and
12   the number pops a little bit because of some
13   exposure to the bottom policies based upon a
14   potential pro rata outcome.  Is that fair?
15             MR. SCHWARTZ:  Objection to form.
16        A.    Can you restate the very beginning
17   of that?
18             MR. KING:  Can you try to read it
19   back, please?
20             (Record read.)
21        A.    Okay.  Yes.  These are the policy
22   allocations of what we saw in 57 --
23        Q.    Page 57?
24        A.    Page 57.
25        Q.    I am just making sure it is clear
```



```
 1                     M. Faggella
 2    on the record.   You are referring to Bates
 3    page 57?
 4         A.   Yes.
 5              And so this first box, yes, that
 6    line saying "weighted total" is the weighted
 7    total when we ran the scenarios at the 482
 8    for each of the individual policies.   And
 9    this box here is the policy outcomes at a
10    billion dollars.
11         Q.   Okay.   So then we turn to this last
12    page, and I will walk through it a little
13    slower.   I appreciate you being responsive.
14         A.   Yes.
15         Q.   So you picked a single scenario
16    that you had developed; right?
17         A.    I was given direction by Claims of
18    what -- how to allocate the settlement.   Our
19    general procedure for allocating settlements,
20    if they are different than the exposure based
21    actual outcome, is to use the information
22    from the exposure based outcome and to -- in
23    this case we selected one particular
24    scenario.
25              So you want to give consideration
```



1                    M. Faggella

2    part of the probability analysis; right?

3        A.    That is a scenario that we

4    modelled.  And what would happen if these

5    claims were being settled in a tort system

6    environment claim by claim, then one of the

7    procedures of how those claims being

8    submitted in the tort environment, claim by

9    claim, is to allocate to the carriers on a

10   pick and spike basis with reallocation.

11       Q.    As part of your work in modelling,

12   were you ever asked to consider the

13   possibility that the Fireman's Fund insurance

14   policies required that there be full payment

15   by the underlying carriers before there was

16   exhaustion?

17       A.    The modelling itself takes into

18   consideration that premise because we are

19   allocating the results to the entire coverage

20   chart.  And so, our policies from the

21   modelling would not be triggered until we

22   have filled up the coverage chart in a

23   horizontal or vertical way to get to us.

24            So if we are triggered in a

25   scenario, that means that what was underneath



```
 1                   M. Faggella
 2    us had to exhaust by the ground-up that was
 3    being sent through the coverage chart.
 4         Q.   When you say "had to exhaust by the
 5    ground-up," do you mean had to exhaust by
 6    virtue of actual payments by the insurers or
 7    by there being sufficient asbestos exposure
 8    for there to be that large a number?
 9         A.   There is sufficient asbestos
10    exposure to be large enough to have exhausted
11    those policies.
12         Q.   In other words, you are referring
13    to a size-of-the-problem type of situation?
14         A.   Yes.
15         Q.   My question was slightly different.
16    It is very simple.  Were you ever asked to
17    consider as part of your modelling or
18    analysis what would happen if the Fireman's
19    Fund policies actually required payment by
20    the insurer, not just by virtue of size of
21    the problem; payment by the insurers under
22    you in order for there to be exhaustion?
23         A.   I mean, these are the scenarios
24    that I modelled, which would have assumed
25    that the ground-up dollars were going through
```



1

2    the coverage chart.  So, I think the answer

3    is no.

4            (Recess.)

5            MR. KING:  Ms. Faggella, thank you

6    for your time and patience.  No further

7    questions.

8            THE WITNESS:  Thank you.

9            MR. SCHWARTZ:  Nothing for me.  Can

10   we just state on the record --

11           MR. KING:  I will not be pressing

12   for the proprietary material.

13           MR. SCHWARTZ:  Thank you.

14           (Time noted:  2:21 p.m.)

15

16

17   Subscribed and sworn to

18   before me this      day

19   of               , 2015.

20

21       Notary Public

22

23

24

25

