UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>   - against -<br><br>ONEBEACON INSURANCE COMPANY as successor-in-interest to GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA,<br><br>        Defendant. | **<u>ORDER</u>**<br><br>14 Civ. 4718 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

     Plaintiff Fireman's Fund Insurance Company ("Fireman's") brings this action against OneBeacon Insurance Company, alleging that OneBeacon breached its obligation to make certain reinsurance payments.  Fireman's issued three insurance policies to Asarco, Inc., one of which OneBeacon reinsures ("Policy 3").  Fireman's settled claims with Asarco for $35 million and allocated a portion of that settlement to Policy 3.  OneBeacon denied Fireman's reinsurance claim, arguing that no portion of Fireman's settlement with Asarco should have been allocated to Policy 3.

     The parties have filed cross-motions for summary judgment.  For the reasons stated below, Fireman's motion will be granted and OneBeacon's motion will be denied.

## BACKGROUND[1]

I.   **REINSURANCE**

This case concerns reinsurance policies. "Simply put, '[r]einsurance is a contract by which one insurer insures the risks of another insurer.'" North River Ins. Co. v. Ace Am. Reinsurance Co., 361 F.3d 134, 137 (2d Cir. 2004) (citing People ex rel. Cont'l Ins. Co. v. Miller, 177 N.Y. 515, 521 (1904)). "[R]einsurance may serve at least two purposes, protecting the primary insurer from catastrophic loss, and allowing the primary insurer to sell more insurance than its own financial capacity might otherwise permit." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 773 (1993) (internal quotation marks omitted). "When entering into a reinsurance contract, a reinsured agrees to pay a particular premium to a reinsurer in return for the reinsurer assuming the risk of a portion of the reinsured's potential financial exposure under certain direct insurance policies it has issued to its insured." North River, 361 F.3d at 137.

"'The scope of the risks assumed by a reinsurer depends upon the terms of the policies that are reinsured.'" Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Am. Re-Ins. Co., 441 F. Supp. 2d 646, 650 (S.D.N.Y. 2006) (quoting BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INS. COVERAGE DISPUTES § 15.01[a] (12th ed. 2004)).

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where a non-moving party disputes a moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

## II.  __FACTS__

The material facts of this case are not in dispute.  Plaintiff Fireman's issued three excess liability insurance policies[2] (collectively, the "Fireman's Policies") to Asarco.  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 4)  Fireman's Policy No. XLX 1481698 ("Policy 1") provides coverage of $20 million for losses in excess of $30 million in excess of a $3 million self-insured retention[3] for the period March 15, 1982 to March 15, 1983.  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 5; Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 48)  Fireman's Policy No. XLX 1534773 ("Policy 2") provides coverage of $20 million for losses in excess of $30 million in excess of a $3 million self-insured retention for the period March 15, 1983 to March 15, 1984.  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 6; Def. R. 56.1 Stmt. (Dkt. No. 41) ¶ 49)  Fireman's Policy No. XLX 1534774 ("Policy 3") provides coverage of $20 million for losses in excess of $75 million in excess of a $3 million self-insured retention for the period March 15, 1983 to March 15, 1984.  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 7; Def. R. 56.1 Stmt. (Dkt. No. 41) ¶ 50)

The Fireman's Policies were part of an annual insurance program purchased by Asarco, which includes sequential layers of insurance referred to as a "coverage tower."  (Def. R. 56.1 Stmt. (Dkt. No. 41) ¶ 47)  Because the Fireman's Policies are excess liability insurance policies, they are not drawn on unless and until underlying insurance policies in the coverage tower are exhausted.  (Def. R. 56.1 Stmt. (Dkt. No. 41) ¶ 52)

---

[2]  "'Excess' liability insurance policies" are insurance policies that "provide insurance protection beyond the protection provided by underlying policies."  Ali v. Fed. Ins. Co., 719 F.3d 83, 86 (2d Cir. 2013).

[3]  Self-insured retention is "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that . . . must be paid [by the insured] before the insurer will pay benefits."  Self-Insured Retention, BLACK'S LAW DICTIONARY (10th ed. 2014).

Policy 3 states that "[i]t is a condition of [the policy] that the insurance afforded under [the policy] shall apply only after all the underlying insurance has been exhausted." (Policy 3 (Dkt. No. 38-9) at 5)  Each of the Fireman's Policies includes a "Schedule of Underlying Insurance."  (Def. R. 56.1 Stmt. (Dkt. No. 41) ¶ 57)  Policy 2 is the underlying insurance for Policy 3.  (Id. ¶ 61)

The Fireman's Policies also contain a Limit of Liability provision, which reads as follows:

Limit of Liability

The Company shall be liable only for the limit of liability stated in Item 3 of the Declarations in excess of the limit or limits of liability of the applicable underlying insurance policy or policies all as stated in the declarations of this policy.  <u>The limit of the liability stated in the declarations as applicable to "each occurrence" shall be the total limit of the Company's liability for all damages sustained as the result of any one occurrence, provided, however, in the event of reduction o[r] exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall in the event of reduction, apply as excess of the reduced limit of liability thereunder.</u>  Subject to the applicable limit of liability as respects each occurrence, the limit of liability stated in the declarations as "aggregate" shall be the total limit of the Company's liability for all damages sustained during each annual period of this policy because of (i) personal injury and property damage arising out of the completed operations hazard and product hazard combined; or (ii) advertising whenever occurring by whatever media, on account of all occurrences; or (iii) injury arising out of any hazard, other than as described in (i) and (ii), to which the underlying policy affords coverage subject to an aggregate limit and to which this policy also applies.

(Policy 3 (Dkt. No. 38-9) at 5 (emphasis added))

General Accident Insurance Company reinsured Policy 3 under a facultative reinsurance[4] contract – the Certificate of Facultative Reinsurance No. FC 4620 (the "Facultative

_____

[4]  "There are two types of reinsurance, facultative and treaty.  Treaty reinsurance obligates the reinsurer to accept in advance a portion of certain types of risks. . . . Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not."

Certificate") covers a 15% share of the risk assumed in Policy 3:  a "$3,000,000 [part of] $20,000,000 excess of $75,000,000 excess of underlying."  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶¶ 8-9)  Defendant OneBeacon[5] is the successor-in-interest to General Accident.  (Id. ¶ 3)

The Facultative Certificate states, inter alia, that "[t]he liability of [OneBeacon] . . . shall follow that of [Fireman's] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [the Fireman's] policy. . . ."  (Facultative Certificate (Dkt. No. 38-12) ¶ 1)  The Facultative Certificate further states that "[a]ll claims involving this reinsurance, when settled by [Fireman's], shall be binding on [OneBeacon]."  (Id. ¶ 3)

In May 2001, Asarco filed an action in Texas state court against Fireman's and its other insurers[6] seeking coverage for claims related to asbestos exposure ("the Asarco Coverage Litigation").  (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 10)  Asarco identified Policies 1, 2 and 3 as the bases for its claims against Fireman's in the Asarco Coverage Litigation.  (Id. ¶ 11)

On August 9, 2005, Asarco filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of Texas.  (Id. ¶ 17)  On December 9, 2009, the Asarco Asbestos Personal Injury Settlement Trust (the "Asarco Trust") assumed some of Asarco's asbestos liabilities and insurance rights.  (Id. ¶ 19)

---

Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co., 979 F.2d 268, 271 (2d Cir. 1992) (citing Matter of Midland Ins. Co., 79 N.Y.2d 253, 258 (1992); Sumitomo Marine & Fire Ins. Co., Ltd. v. Cologne Reinsurance Co. of Am., 75 N.Y.2d 295, 301 (1990)).

[5]  Defendant OneBeacon's name has been changed to Bedivere Insurance Company.  (See Def. R. 56.1 Stmt. (Dkt. No. 46) at 1 n.1)  The parties have agreed to refer to the defendant as "OneBeacon" for purposes of their cross-motions for summary judgment.  (Id.)

[6]  See ASARCO LLC, et al. v. Allstate Insurance Company, et al., Cause No. 01-2680-D (105th Jud. Dist. Nueces County, Tex.) (later re-captioned as ASARCO LLC, et al. v. Fireman's Fund Insurance Company, et al.)

In November 2009, Fireman's estimated its potential exposure in the Asarco Coverage Litigation at $50.3 million.  (Id. ¶ 35)  In June 2011, Fireman's and the Asarco Trust entered into a Settlement Agreement (the "Settlement Agreement") in which Fireman's agreed to pay Asarco $35 million.  (Id. ¶¶ 39-40)  Fireman's allocated the $35 million settlement among Policies 1, 2 and 3, in proportion to the allocation set forth in its November 2009 exposure analysis.  (Id. ¶ 40)  Fireman's allocated $8,103,919 to Policy 3. (Id. ¶ 41)

In January 2013, Fireman's billed OneBeacon under the Facultative Certificate for a total of $1,744,250.08.  (Id. ¶ 42)  This sum reflects:  (1) 15% of the $8,103,919 indemnity allocated to Policy 3, which amounts to $1,215,587.85; (2) OneBeacon's 15% share of the claim adjustment expenses paid by Fireman's, which amounts to $119,071.11; and (3) OneBeacon's 15% share of the expenses Fireman's incurred in the Asarco Coverage Litigation, which amounts to $409,591.12.  (Id.)

In April 2014, OneBeacon – through its claims manager, Resolute Management, Inc. – denied Fireman's claim.  (Id. ¶ 43)  On June 26, 2014, Fireman's filed the Complaint in the instant case.  (Cmplt. (Dkt. No. 2))

## III.  PROCEDURAL BACKGROUND

The Complaint was filed on June 26, 2014.  (Id.)  On July 2, 2015, the parties filed cross-motions for summary judgment.  (Pltf. Mot. (Dkt. No. 34); Def. Mot. (Dkt. No. 44))

On March 31, 2016, this Court denied without prejudice the parties' cross-motions for summary judgment, finding that the parties had not briefed cases that were critical to resolving their motions.  (Mar. 31, 2016 Order (Dkt. No. 56) at 2)

At an April 7, 2016 conference, the Court directed the parties to provide supplemental briefing concerning North River Ins. Co. v. Ace Am. Reinsurance Co., 361 F.3d

134 (2d Cir. 2004), and <u>Ali v. Fed. Ins. Co.</u>, 719 F.3d 83 (2d Cir. 2013).  The Court also directed

the parties to address the public policy implications of various potential rulings.  (Apr. 7, 2016

Tr. (Dkt. No. 58) at 4-7)  That same day, this Court issued a scheduling order for supplemental

briefing.

Both sides submitted supplemental briefing and renewed their motions for

summary judgment.  (Pltf. Supp. Br. (Dkt. No. 60) at 5; Def. Supp. Br. (Dkt. No. 61) at 4)

<u>**DISCUSSION**</u>

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted where the moving party shows that "there is no

genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56.1(a).  "A dispute about a 'genuine issue' exists for summary judgment

purposes where the evidence is such that a reasonable jury could decide in the non-movant's

favor."  <u>Beyer v. Cnty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (citing <u>Guilbert v. Gardner</u>,

480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of

proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an

essential element of the non[-]moving party's claim.'"  <u>Lesavoy v. Lane</u>, No. 02 Civ. 10162,

2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting <u>Bay v. Times Mirror Magazines,

Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

<u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

7

summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451,

1456.1 (2d Cir. 1995)).  "Assessments of credibility and choices between conflicting versions of

the events are matters for the jury, not for the court on summary judgment."  Eviner v. Eng, No.

13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine,

Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

   "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party.  Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration."  Id. (internal citation omitted).

## II.  INTERPRETATION OF INSURANCE POLICIES

   The Court evaluates the insurance policies and Facultative Certificate at issue

under New York law.[7]

---

[7]  Neither side has performed a substantive choice of law analysis.  Fireman's states that "the reinsurance contract could conceivably be governed by the law of New York," but asserts that a choice of law analysis is unnecessary, because "cases from several jurisdictions have applied follow-the-settlement[] [clauses] consistently."  (Pltf. Br. (Dkt. No. 35) at 18 n.13)  OneBeacon contends that Texas or New York law applies, but states that "[u]nder both Texas and New York law, courts enforce insurance policies as written where the language used is clear and unambiguous."  (Def. Br. (Dkt. No. 45) at 25)  This Court sees no substantive difference in how Texas and New York courts have treated the relevant principles of contractual interpretation and follow-the-settlements clauses in particular.  Accordingly, this Court applies New York law.  See Union Cent. Life Ins. Co. v. Berger, 10 Civ. 8408 PGG, 2012 WL 4217795, at *8 n.11 (S.D.N.Y. Sept. 20, 2012) aff'd, 612 F. App'x 47 (2d Cir. 2015) ("'In the absence of substantive difference [between the potentially applicable state laws], [] a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to

> Under New York law, insurance policies are interpreted according to general rules of contract interpretation.  E.g., World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 183-84 (2d Cir. 2003), abrogated on other grounds, Wachovia Bank v. Schmidt, 546 U.S. 303 (2006). . . . [T]he "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and ellipsis omitted).  Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."  Id. (citation omitted).

Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 98-99 (2d Cir. 2012).

"'The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide.'"  Two Farms, Inc. v. Greenwich Ins. Co., 993 F. Supp. 2d 353, 358 (S.D.N.Y. 2014) (quoting In re Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998)), aff'd, 628 F. App'x 802 (2d Cir. 2015)).  "An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) (quoting Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000)).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."  Olin Corp., 704 F.3d at 99.

---

apply it.'" (quoting Licci v. Am. Express Bank Ltd., 704 F. Supp. 2d 403, 409 (S.D.N.Y. 2010))).

### III.   THE "FOLLOW THE SETTLEMENTS" DOCTRINE

"The follow-the-fortunes doctrine 'binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation.'" North River, 361 F.3d at 139-40 (quoting British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 85 (2d Cir. 2003)).

The "'follow the settlements [doctrine]' . . . essentially describes the follow-the-fortunes doctrine in the settlement context." Id. at 136 n.2.[8]

> The purpose of the follow the settlements doctrine is to prevent the reinsurer from "second-guessing" the settlement decisions of the ceding company. Absent such a rule, an insurance company would be obliged to litigate coverage disputes with its insured before paying any claims, lest it first settle and pay a claim, only to risk losing the benefit of reinsurance coverage when the reinsurer raises in court the same policy defenses that the original insurer might have raised against its insured.

Aetna Cas. & Sur. Co. v. Home Ins. Co., 882 F. Supp. 1328, 1346 (S.D.N.Y. 1995). "The follow-the-fortunes principle does not change the reinsurance contract; it simply requires payment where the cedent's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured." Mentor Ins. Co. (U.K.) v. Brannkasse, 996 F.2d 506, 517 (2d Cir. 1993); see also Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992) ("Under the 'follow the fortunes' doctrine, a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it.").

The Second Circuit has held "that the follow-the-settlements doctrine extends to a cedent's post-settlement allocation decisions." North River, 361 F.3d at 141. Accordingly,

---

[8] Here, the parties use the two terms interchangeably. See Pltf. Reply Br. (Dkt. No. 40) at 10 n.2; Def. Br. (Dkt. No. 45) at 20 n.14.

courts are barred from "inquir[ing] into the propriety of a cedent's method of allocating a settlement if the settlement itself was in good faith, reasonable, and within the terms of the policies." Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am., 419 F.3d 181, 189 (2d Cir. 2005). And, as Defendant admits, the follow-the-settlements doctrine applies where "the cedent's decisions [are] based on a reasonable interpretation of the contracts at issue, the law, and the facts." (Def. Br. (Dkt. No. 45) at 18)

## IV.   <u>ANALYSIS</u>

Fireman's argues "that OneBeacon's refusal to pay [Fireman's] is a clear breach of the reinsurance contract," and that "[u]nder [the contract's] 'follow-the-settlements' provision, OneBeacon is unquestionably bound by [Fireman's] settlement with ASARCO." (Pltf. Br. (Dkt. No. 35) at 5) OneBeacon counters that "[t]he 'follow-the-settlements' provision cannot cure [Fireman's] failure to comply with the exhaustion requirements in the underlying Policies." (Def. Br. (Dkt. No. 45) at 8)

As noted above, "[t]he Facultative Certificate is the reinsurance contract at issue in this action." (Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 9) The Facultative Certificate provides that "the amount of liability . . . shall follow that of [Fireman's] and except as otherwise specifically provided here-in, shall be subject in all respects to all the terms and conditions of [Fireman's] policy." (Facultative Certificate (Dkt. No. 38-12) ¶ 1) The Facultative Certificate further states that "[a]ll claims involving this reinsurance, when settled by [Fireman's], shall be binding on [OneBeacon.]" (Id. ¶ 3) The parties agree that these paragraphs constitute a "follow-the-settlements" provision. See Pltf. Br. (Dkt. No. 35) at 18 (referring to paragraph 3 "as a 'follow-the-settlements' or 'follow-the-fortunes' clause"); Def. Br. (Dkt. No. 45) at 14 (referring to paragraph 1 as "a 'following form' provision," and noting that paragraph 3 makes a "[a] claim by

[Fireman's] under the Facultative Certificate . . . binding on OneBeacon . . if [Fireman's] complies with all underlying policy provisions").

In light of the Facultative Certificate's "follow-the-settlements" provision, Fireman's argues that deference must be given to its liability allocation in accordance with the "follow-the-settlements" doctrine.  According to Fireman's, that doctrine "creates a presumption that the reinsurer is required to indemnify the reinsured for its share of any payments made under a policy covered by the reinsurance contract."  (Pltf. Br. (Dkt. No. 35) at 19)  This presumption applies where "'several reasonable allocations are possible,'" as long as the "'reinsured's allocation [is] one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist.'"  (Id. at 23 (quoting U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co., 20 N.Y.3d 407, 420 (2013)))

OneBeacon contends that "(1) the allocation is not reasonable because it violates the express exhaustion requirement of [Fireman's] own policies; and (2) the settlement is outside the scope of the Facultative Certificate, which incorporates the Limit of Liability provision and does not attach below $78 million."  (Def. Br. (Dkt. No. 45) at 23)  Although OneBeacon presents these points as separate arguments, they raise the same issue – whether Fireman's allocation falls within the terms of Policy 3 and the Facultative Certificate.  (See Def. Reply (Dkt. No. 48) at 6 ("[W]here [Fireman's] allocated a settlement to Policy 3 without first fully exhausting underlying Policies 1 and 2, it not only violated the exhaustion provision of Policy 3, but it also violated the Facultative Certificate."))

Resolution of the parties' dispute turns on the meaning of the term "exhaustion" as used in the Fireman's Policies.  According to Fireman's, "exhaustion" is "'ambiguous and susceptible to the meaning . . . that a [primary] policy can be exhausted when an insured and a

[primary] insurer enter into a settlement agreement. . . .'"  (Pltf. Reply Br. (Dkt. No. 40) at 17-18

(quoting Trinity Homes LLC v. Ohio Cas. Ins. Co., 629 F.3d 653, 658 (7th Cir. 2010)))

    According to OneBeacon, however, "[t]he only real issue . . . is whether

[Fireman's] breached the specific 'exhaustion' provision found in the Policies when it allocated a

portion of the settlement to Policy 3 without first paying its full limits under Policies 1 and 2."

(Def. Br. (Dkt. No. 45) at 8)  OneBeacon argues that "[t]he [Fireman's] policies [at issue] are

excess policies that sit above 'underlying insurance' and do not pay until there is 'exhaustion' of

the policies below them."  (Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 52; see also Travelers Cas. & Sur.

Co., 419 F.3d at 183 n.2 ("Insurers often offer both primary and excess coverage. . . . [E]xcess

policies are called upon to provide coverage only when the lower layers have been exhausted."))

  A.  **"Exhaustion" as Used in the Fireman's Policies**

    Two provisions in Policy 3 address exhaustion.  Under a subheading entitled

"Payment of Loss," Policy 3 provides that "[i]t is a condition of this policy that the insurance

afforded under this policy shall apply only after all underlying insurance has been exhausted."

(Policy 3 (Dkt. No. 38-9) at 3)  This provision does not define "exhaustion."

    Under a subheading entitled "Limit of Liability," Amendatory Endorsement 1 to

Policy 3 provides that

> [t]he limit of the liability stated in the declarations as applicable to "each
> occurrence" shall be the total limit of the Company's liability for all damages
> sustained as the result of any one occurrence, provided, however, in the event of
> reduction or exhaustion of the applicable aggregate limit or limits of liability
> under said underlying policy or policies solely by reason of losses paid thereunder
> on account of occurrences during this policy period, this policy shall in the event
> of reduction, apply as excess of the reduced limit of liability thereunder.

(Id. at 5)

OneBeacon contends that these provisions "require[] that all underlying policies, including Policies 1 and 2, be fully exhausted by payment [up to] policy limits by the underlying insurers before coverage [under Policy 3] is triggered."  (Def. Br. (Dkt. No. 45) at 23)

Relying on the Second Circuit's decision in <u>Zeig v. Massachusetts Bonding Co.</u>, however, Fireman's argues that Policies 1 and 2 were exhausted by settlement, which is permissible "unless an excess policy unambiguously provides that underlying policies can be exhausted only by the carrier's <u>payment</u> of the full limit. . . ."  (Pltf. Br. (Dkt. No. 35) at 25 (citing <u>Zeig v. Massachusetts Bonding Co.</u>, 23 F.2d 665, 666 (2d Cir. 1928)) (emphasis in original))  Fireman's argues that in other "recent cases [that] have held that underlying coverage was not exhausted by settlements[,] . . . the language of the relevant excess policy was arguably unambiguous in requiring exhaustion by payment rather than settlement."  (<u>Id.</u> at 25-26 (citing <u>Ali v. Fed. Ins. Co.</u>, 719 F.3d 83, 91 (2d Cir. 2013); <u>Citigroup v. Federal Ins. Co.</u>, 649 F.3d 367, 372 (5th Cir. 2011)))  Here, by contrast, "Policy 3's provision on 'Payment of Loss' says nothing about exhaustion by payment[.]"  (<u>Id.</u> at 26)

## B.   Relevant Law

In <u>Zeig</u>, plaintiff was a dressmaker who had three insurance policies providing $15,000 in coverage, as well as an excess policy for $5,000 to "apply and cover only after all other insurance herein referred to shall have been exhausted in the payment of claims to the full amount of the expressed limits of such other insurance."  <u>Zeig</u>, 23 F.2d at 665.  Plaintiff's business was burglarized, and plaintiff settled his claims under the three primary insurance policies for $6,000.  <u>Id.</u>  Plaintiff then sought to recover under the excess policy.

The trial court held that the primary policies had not been exhausted, because "plaintiff had settled his claims on these policies for less than their face amount[.]"  <u>Id.</u>  The

Second Circuit reversed, however, noting that the excess policy at issue in <u>Zeig</u> said "[n]othing . . . about the 'collection' of the full amount of the primary insurance.  The clause provides only that it be 'exhausted in the payment of claims to the full amount of the expressed limits.'"  <u>Id.</u> at 666.  The court held that Zeig "should have been allowed to prove the amount of his loss, and, if that loss was greater than the amount of the expressed limits of the primary insurance, he was entitled to recover the excess to the extent of the policy in suit."  <u>Id.</u>

The <u>Zeig</u> court explained that "requir[ing] an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable."  <u>Id.</u>  The court went on to hold that "[t]he claims are paid to the full amount of the policies[] if they are settled and discharged, and the primary insurance is thereby exhausted.  There is no need of interpreting the word 'payment' as only relating to payment in cash."  <u>Id.</u>  According to the <u>Zeig</u> court, this outcome can be avoided only "when the terms of the contract demand it."  <u>Id.</u>

One court in this District has described <u>Zeig</u> as "the seminal decision interpreting New York insurance law in this Circuit."  <u>Lexington Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co.</u>, 11 Civ. 391 (DAB), 2012 WL 1278005, at *3 (S.D.N.Y. Mar. 28, 2012).  It "stands for the proposition that, if an excess insurance policy ambiguously defines 'exhaustion,' settlement with an underlying insurer constitutes exhaustion of the underlying policy, for purposes of determining when the excess coverage attaches."  <u>Citigroup Inc. v. Fed. Ins. Co.</u>, 649 F.3d 367, 371 (5th Cir. 2011) (citing Tod I. Zuckerman, <u>Settlement with Primary Insurer for Less Than Policy Limits</u>, § 10:22 (2010)); <u>see</u> <u>also</u> <u>Lexington Ins. Co.</u>, 2012 WL 1278005, at *4 ("In the absence of unambiguous language requiring exhaustion via full payment of the underlying policy, no such exhaustion is required.").

In <u>Ali v. Fed. Ins. Co.</u>, 719 F.3d 83 (2d Cir. 2013), however, the Second Circuit cast doubt on <u>Zeig</u>'s continued viability.

In <u>Ali</u>, the court considered three excess liability insurance policies, each of which contained an exhaustion clause "stat[ing] that the excess insurance coverage attaches only after a certain amount of underlying insurance coverage is exhausted 'as a result of payment of losses thereunder.'" <u>Ali</u>, 719 F.3d at 86.  The insureds argued that "their <u>liability</u> must reach the attachment point in order to trigger the excess coverage.  By contrast, the insurer appellees argue[d] that the excess liability coverage is only triggered when liability <u>payments</u> reach the attachment point." <u>Id.</u> (emphasis in original).  The <u>Ali</u> court found the exhaustion language in all three excess liability policies unambiguous, and concluded that the "coverage obligation is not triggered until <u>payments</u> reach the respective attachment points." <u>Id.</u> at 91 (emphasis in original).

In ruling in favor of the insurers, the court rejected the insureds' reliance on <u>Zeig</u>. As an initial matter, the <u>Ali</u> court comments – in a footnote – that, although it is "not necessary to [the court's] decision, it bears recalling that the freestanding federal common law that <u>Zeig</u> interpreted and applied no longer exists." <u>Id.</u> at 92 n.16.

The court then proceeds to distinguish Zeig on its facts, "noting important differences between Zeig and this case":

> [There is] nothing . . . inherently errant or unusual about interpreting an exhaustion clause in an excess <u>liability</u> insurance policy differently than a similarly written clause in a first-party <u>property</u> insurance policy.  "[I]n interpreting contractual language," like language in any other legal text, "[t]he text should always be read in context."

<u>Id.</u> at 93 (quoting <u>Int'l Multifoods Corp. v. Commercial Union Ins. Co.</u>, 309 F.3d 76, 87 n.4 (2d Cir. 2002) (emphasis and alterations in <u>Ali</u>).

The <u>Ali</u> court went on to distinguish

16

Zeig and the other related cases on which the [insureds] rely [as] principally
address[ing] situations in which a policy was deemed exhausted as a result of an
insured's below-limit settlement of indemnity claims with an underlying
carrier. . . . In those cases, the insured suffered out-of-pocket losses (for instance,
through the loss of property, or through liability payments to a third party) for
which the insured sought indemnification.  [Plaintiffs'] requested relief, by
contrast, focuses on their obligations to pay third parties.  In these circumstances,
we agree with the District Court that this difference is relevant when structuring
(and interpreting) a liability insurance policy.  As the District Court noted, [the
excess insurers]

> have a clear, bargained-for interest in ensuring that the underlying policies
> are exhausted by actual payment.  If [the Directors] were able to trigger
> the Excess Policies simply by virtue of their aggregated [but unpaid]
> losses, they might be tempted to structure inflated settlements with their
> adversaries in the Bahamas Litigation that would have the same effect as
> requiring the Excess Insurers to drop down and assume coverage in place
> of the insolvent carriers.

Id. (quoting Fed. Ins. Co. v. Estate of Gould, No. 10 CIV. 1160 RJS, 2011 WL 4552381, at *7

(S.D.N.Y. Sept. 28, 2011)) (internal quotation marks and citations omitted) (emphasis in

original).  The court went on to hold that the "plain language of the relevant excess insurance

policies requires the 'payment of losses' – not merely the accrual of liability – in order to reach

the relevant attachment points and trigger the excess coverage.  Id. at 94.

> Finally, in North River Ins. Co. v. Ace Am. Reinsurance Co., 361 F.3d 134 (2d

Cir. 2004), North River had provided various excess liability policies to Owens-Corning, and

ACE American Reinsurance Company ("ACE") had reinsured a portion of North River's

coverage.  See North River, 361 F.3d at 136-38.  Owens-Corning brought coverage claims

against North River, and North River settled Owens-Cornings' claims for $335 million pursuant

to the Wellington Agreement – "an accord reached between a group of insureds, facing

thousands of asbestos-product claims, and their insurers."  North River, 361 F.3d at 137-38 &

n.4.  The Wellington Agreement "calls for asbestos payments to be allocated on the basis of

horizontal exhaustion, which means losses are allocated to the lowest layer of coverage first, and

like a bathtub, fill from the bottom layer up."  Id. at 138 n.6.  Pursuant to the Wellington

Agreement, Owens-Corning and North River "agreed in compromise that the amount of Owens-

Corning's insured loss, over the life of the policies, was \$335 million . . . [, which] did not

exceed the coverage limits of [the] second excess layer policies."  Id. at 142.

North River sought \$49 million in indemnification from its reinsurer ACE, under

the "rising bathtub" approach required by the Wellington Agreement.  Id. at 138 & n.6.

> ACE dispute[d] the settlement allocation because North River assigned its entire
> settlement to ACE's layer of reinsurance (the second layer), even though North
> River's pre-settlement analysis of possible litigation outcomes identified risk of
> loss in higher layers.  ACE argue[d] that it should not have to contribute to the
> portion of the settlement that, under North River's pre-settlement analyses,
> reflected the risk to layers above ACE's layer of coverage being implicated.

Id. at 138.

The Second Circuit ruled, however, that the follow-the-settlements doctrine

applies to a "cedent's post-settlement allocation decisions," and that ACE "confuse[d] risk of

loss, and loss.  ACE did not contract to pay 'risk of loss,' nor is it clear that North River could

require its upper layer reinsurers to pay a 'risk of loss.'"  Id. at 141-42.  The North River court

further stated that

> [a]n insurer may engage in all manner of analyses to inform its decision as to
> whether, and at what amount, to settle, but those analyses are irrelevant to the
> contractual obligation of the reinsurer to indemnify the reinsured for loss under the
> reinsurance policy.  When a claim is adjudicated or compromised at a figure
> that falls within, e.g., the first layer of coverage, the risk as to the second and
> higher levels is eliminated, and no "loss" is suffered in any layer other than the
> first.

Id. at 142.

C.      <u>Application</u>

1.      **Whether the Term "Exhaustion" in the**
**<u>Fireman's Policies is Ambiguous</u>**

OneBeacon argues that "<u>Zeig</u> only applies in the presence of ambiguous exhaustion language" and that "[c]ourts following <u>Zeig</u> have uniformly confirmed that below limits settlements apply to functionally exhaust an underlying policy only if the excess policy does not clearly and unambiguously require payment of the underlying limits by the underlying carrier." (Def. Supp. Br. (Dkt. No. 61) at 11) OneBeacon also contends that "<u>Ali</u> overrules <u>Zeig</u> with respect to below limits settlements in the context of liability insurance." (<u>Id.</u> at 10)

Fireman's argues, however, that "exhaustion" as used in the Fireman's policies is "'ambiguous and susceptible to the meaning . . . that a [primary] policy can be exhausted when an insured and a [primary] insurer enter into a settlement agreement. . . .'" (Pltf. Reply Br. (Dkt. No. 40) at 17-18 (quoting <u>Trinity Homes LLC v. Ohio Cas. Ins. Co.</u>, 629 F.3d 653, 658 (7th Cir. 2010))) Moreover, according to Fireman's, "<u>Ali</u> . . . distinguished <u>Zeig</u> . . . on grounds that did not undermine either <u>Zeig</u>'s continuing vitality, or its relevance to the exhaustion issue here." (Pltf. Supp. Br. (Dkt. No. 60) at 11)

In <u>Ali</u>, the excess liability policies provided that exhaustion occurred when the underlying policies were "exhausted 'as a result of payment of losses thereunder.'" <u>Ali</u>, 719 F.3d at 86. Those policies also state what the effect is when the exhaustion condition is met – <u>inter alia</u>, the "remaining limits available under this policy shall . . . continue for subsequent losses as primary insurance. . . ." <u>Ali</u>, Joint App'x at 283. Here, by contrast, Policy 3 merely states that "[i]t is a condition of this policy that the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted." (Policy 3 (Dkt. No. 38-9) at 3) But that provision does not define "exhaustion."

OneBeacon contends that this Court should look to Amendatory Endorsement 1 to Policy 3 in determining the meaning of "exhaustion."  As set forth above, that provision states that

> [t]he limit of the liability stated in the declarations as applicable to "each occurrence" shall be the total limit of the Company's liability for all damages sustained as the result of any one occurrence, provided, however, <u>in the event of reduction or exhaustion</u> of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall <u>in the event of reduction</u>, apply as excess of the reduced limit of liability thereunder.

(<u>Id.</u> at 5 (emphasis added))

This clause provides a clear answer as to what happens "in the event of reduction . . . solely by reason of losses paid":  the policy shall "apply as excess of the reduced limit of liability."  (<u>Id.</u>)  OneBeacon contends, however, that the phrase "solely by reason of losses paid" requires that "exhaustion" – as used in Policy 3 – must be read to require actual payment under the underlying insurance policies.  This argument is not persuasive.

Amendatory Endorsement 1 only clarifies what happens "in the event of reduction . . . by reason of losses paid thereunder," which is that Policy 3 shall "apply as excess of the reduced limit of liability thereunder."  (<u>Id.</u>)  In other words, if Asarco were to suffer a loss that is paid by an underlying policy, that payment would "reduce" not only the aggregate limit in the underlying policy by the amount paid, but also the limit of liability in Policy 3.  But Amendatory Endorsement 1 does not establish that "exhaustion" under Policy 3 requires an actual payment up to the underlying policy's limits.

The Court concludes that Policy 3 is ambiguous as to the meaning of "exhaustion."  The language cited by the <u>Ali</u> court – "as a result of payment of losses thereunder" – is not present here.  <u>Zeig</u> tells us that because Policy 3 is ambiguous as to the

meaning of "exhaustion, Policy 3 does not "require collection of the primary policies as a condition precedent to the right to recover excess insurance."  Zeig, 23 F.2d at 666.  Zeig also tells us that claims have been "paid to the full amount of the policies[] if they are settled and discharged."  Under Zeig, "the primary insurance is thereby exhausted."  Id.

This Court further concludes that the grounds on which Ali distinguished Zeig are not relevant here.  As discussed above, the Ali court distinguished "Zeig and the other related cases on which the [insureds] rely [as] principally address[ing] situations in which a policy was deemed exhausted as a result of an insured's below-limit settlement of indemnity claims with an underlying carrier."  Ali, 719 F.3d at 93 (internal quotation marks and citations omitted).  The Ali court emphasized that in Zeig and its progeny "the insured suffered out-of-pocket losses," as distinguished from mere "obligations to pay third parties."  Id. (emphasis in original).  Zeig and the other cases that the Ali court distinguished present the precise scenario at issue here, however:  Asarco reached a below-limit settlement with Fireman's, the underlying carrier, and the liability paid by Fireman's constitutes an out-of-pocket loss.  Accordingly, Ali does not preclude the application of Zeig here.

## 2.    The Effect of the Ibello Deposition on the Meaning of "Exhaustion" as Used in Policy 3

In arguing that the "Limit of Liability" provision discussed above provides that "exhaustion" means payment up to the limits of underlying policies, OneBeacon cites the following deposition testimony from Gary Ibello, Fireman's Rule 30(b)(6) designee (Def. Supp. Br. (Dkt. No. 61) at 12):

> Q:  Can you show me what the provisions within this policy are that identify the exhaustion requirements under the policy? . . . .
>
> A:  Okay.  The limits of liability section, I think this basically addresses the underlying insurance issues.

. . . .

Q:  You specifically referred me to the limit of liability provision to understand what "exhaustion" means within the terms of this policy, correct?

A:  Yes.

Q:  That is where you would look if you were looking for exhaustion requirements, right?

A:  Yes.  I would look at the whole policy to make sure there aren't any other provisions.

Q:  Are there any other provisions that you would refer to in determining the exhaustion requirements under this policy?

A:  Well, the insurance agreement under "coverage" has a reference to loss in excess of the insurance. . . . That is another term that bears on "exhaustion" generally, yes.

(Ibello Dep. (Dkt. No. 47-1) at 97:13-22; Ibello Dep. (Dkt. No. 61-1) at 108:20-109:23)

Contrary to OneBeacon's argument, Ibello's testimony does not establish that Policy 3 contains a definition of "exhaustion."  Ibello merely states where one would look in Policy 3 for exhaustion requirements.  Ibello does not concede that Policy 3 defines "exhaustion" unambiguously.[9]

The Court concludes that Fireman's interpretation of the term "exhaustion" as used in Policy 3 is reasonable.

---

[9]  OneBeacon argues that Ibello's purported "admission is clear and binding" (Def. Supp. Br. (Dkt. No. 61) at 12-13 (citing Astra Aktiebolag v. Andrx Pharm., Inc., 222 F. Supp. 2d 423, 597 (S.D.N.Y. 2002), aff'd sub nom. In re Omeprazole Patent Litig., 84 F. App'x 76 (Fed. Cir. 2003))), but OneBeacon confuses testimony about facts with questions of law.  In Astra Aktiebolag, the "binding admissions" were relied on by the court to answer, for purposes of patent validity, the factual question of whether a scientist's work "disclose[d] administration of [the patented drug molecule] sufficient to treat [an] infection."  Astra Aktiebolag, 222 F. Supp. 2d at 597.  But contract interpretation presents a question of law, not of fact.  See Two Farms, 993 F. Supp. 2d at 358 ("The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide.")

3.      **Exhaustion Provisions at Issue in Other Cases**

OneBeacon cites to cases involving unambiguous policy language much different than that at issue here.  (See Def. Br. (Dkt. No. 45) at 25-28)

As to Texas law, OneBeacon cites Citigroup Inc. v. Federal Ins. Co., 649 F.3d 367 (5th Cir. 2011).  (Def. Br. (Dkt. No. 45) at 25-26)  There, the policy "provide[d] that coverage attaches '[i]n the event of the exhaustion of all of the limit(s) of liability of such 'Underlying Insurance' solely as a result of payment of loss thereunder.'"  Citigroup, 649 F.3d at 373.

As to New York law, OneBeacon cites Forest Labs., Inc. v. Arch Ins. Co., 38 Misc. 3d 260 (N.Y. Sup. Ct. 2012), aff'd, 116 A.D.3d 628, 24 N.Y.3d 901 (2014) and J.P. Morgan Chase & Co. v. Indian Harbor Insurance Company, 98 A.D.3d 18 (1st Dept. 2012). (Def. Br. (Dkt. No. 45) at 26-27)  The policy at issue in Forest Labs stated, "[i]t is agreed that the Insurer shall not pay any amount until all retentions and Underlying Limits of Liability have actually been paid. . . ."  38 Misc. 3d at 263 (emphasis in original).  In J.P. Morgan, the "policy provided that the insurance afforded thereunder 'shall apply only after all applicable Underlying Insurance with respect to an Insurance Product has been exhausted by actual payment under such Underlying Insurance.'"  J.P. Morgan, 98 A.D.3d at 22.

In sum, in all three cases, the policies made clear that exhaustion occurred by either "payment of loss" or "actual payment," while the analogous provision here simply states that "[i]t is a condition of this policy that the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted."[10]  (Policy 3 (Dkt. No. 38-9) at 3)

_____

[10]  OneBeacon argues that "[c]ourts in other jurisdictions have also found language similar to the Policy 3 language to require exhaustion by payment by the underlying insurers and, in at least one case, [Fireman's] has been granted summary judgment based on the very provision at issue

23

Because Policy 3 does not define "exhaustion," the cases cited by

Defendant – which involve insurance policies that much more clearly define

"exhaustion" – are not persuasive.  Indeed,

> [t]he majority of the cases defendant relies upon in fact illustrate that policies can be written so unambiguously as to overcome the public policy concerns articulated in Zeig.  Including language making clear that exhaustion requires the carriers themselves to pay out the full amount of their policies, or even a clear statement that settling for less than the full amount of coverage voids the excess coverage, would render the exhaustion provision absolutely clear.

Maximus, Inc. v. Twin City Fire Ins. Co., 856 F. Supp. 2d 797, 803 (E.D. Va. 2012).

### 4.    *North River*

North River is not to the contrary.  In North River, the Wellington Agreement –

the agreement that governed the settlement – was unambiguous in its approach to allocating

losses.  The Wellington Agreement required "allocat[ion] on the basis of horizontal exhaustion,

which means losses are allocated to the lowest layer of coverage first, and like a bathtub, fill

from the bottom layer up."  North River, 361 F.3d at 138 n.6.  The settlement agreement thus

---

in this case."  (Def. Br. (Dkt. No. 45) at 27)  Many of the cases cited by OneBeacon involve policies with much clearer language regarding the meaning of exhaustion.  See Great Am. Ins. Co. v. Bally Total Fitness Holding Corp., No. 06-CV-04554, 2010 WL 2542191, at *1 (N.D. Ill. June 22, 2010) ("[o]nly after all Underlying Insurance has been exhausted by payment of the total underlying limit of insurance"; "solely as a result of actual payment of loss or losses thereunder"); Mission Nat. Ins. Co. v. Duke Transp. Co., 792 F.2d 550, 551 (5th Cir. 1986) ("[i]n the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this policy . . . shall . . . in the event of exhaustion continue in force as the underlying insurance"); Comerica Inc. v. Zurich Am. Ins. Co., 498 F. Supp. 2d 1019, 1032 (E.D. Mich. 2007) ("[The] policy does not provide coverage for any loss not covered by the 'Underlying Insurance' except and to the extent that such loss is not paid under the 'Underlying Insurance' solely by reason of the reduction or exhaustion of the available 'Underlying Insurance' through payments of loss thereunder."); Wells Fargo Bank v. California Ins. Guarantee Assn., 45 Cal. Rptr. 2d 537, 542 (1995) ("In the event of reduction or exhaustion of the aggregate limits of liability applicable to the underlying insurance . . . by reason of losses paid thereunder, this policy shall . . . in the event of exhaustion continue in force as underlying insurance.").  While Alabama Ins. Guar. Ass'n v. Kinder-Care, Inc., 551 So. 2d 286, 289 (Ala. 1989) involves language identical to the policies at issue here, the Kinder-Care court applied Alabama law, and not New York or Texas law.  Id. at 287.

explicitly addressed the question to be answered here.  Moreover, because of the settlement

agreement, it was necessary for the Second Circuit to address only the question of whether a

"rising bathtub" allocation was permissible – because that was the approach the primary insurer

applied under the follow-the-settlements provisions.  The court did not consider whether the

"rising bathtub" approach was mandated.  Id. at 141.  The settlement agreement also included an

explicit provision as to the amount of loss – $335 million – which the parties have not claimed

existed here.  Id. at 142.  Given the settlement agreement, it would have been unreasonable to

allocate payments among policies based on a higher amount of loss – indeed, the settlement

agreement mandated the court's finding that "no 'loss' is suffered in any layer other than the

first."  Id.

    Finally, other than in explaining what a "rising bathtub" approach is, the North

River court does not mention the term "exhaustion."  See id. at 138 & n.6.  The decision likewise

contains no discussion of Zeig.  In short, the result in North River does not turn on the meaning

of the term "exhaustion" under the relevant insurance policies, as is the case here.

    While OneBeacon contends that "the follow-the-settlements doctrine cannot

override the language of the underlying policy or the reinsurance contract" (Def. Supp. Br. (Dkt.

No. 61) at 17), this argument – while correct – is irrelevant here, because the reinsurance

contract at issue was ambiguous as to the meaning of "exhaustion."

    **5.**   **Whether OneBeacon Is Bound by Fireman's Allocation**

    OneBeacon does not raise any other challenge to Fireman's settlement with

Asarco.  Indeed, OneBeacon states that "[t]he only real issue . . . is whether [Fireman's]

breached the . . . 'exhaustion' provision."  (Def. Br. (Dkt. No. 45) at 8)  There is no suggestion

that Fireman's acted in bad faith in settling the case or that the settlement is otherwise

unreasonable.  OneBeacon "does not question [Fireman's] decision to settle the ASARCO case for $35 million," noting that "there is sufficient support in the record for that settlement and that is a discretionary follow-the-settlements issue."  (Id. at 18)  As discussed above, the Second Circuit has instructed that district courts shall not "inquir[e] into the propriety of a cedent's method of allocating a settlement if the settlement itself was in good faith, reasonable, and within the terms of the policies."  Travelers Cas. & Sur. Co., 419 F.3d at 189.  The New York Court of Appeals has similarly held that "a follow the settlements clause does require deference to a cedent's decisions on allocation."  U.S. Fid. & Guar. Co., 20 N.Y.3d 407, 419 (2013) (internal citations omitted).

> There has been no suggestion here that the underlying settlement was not taken in good faith or was unreasonable; indeed, [OneBeacon] explicitly states that it is not questioning the underlying settlement.  Furthermore, as explained above, the settlement covered claims that were at least arguably within the terms of the policy.  An inquiry into the reasonableness of [Fireman]'s post-settlement allocation is therefore inappropriate in light of Travelers Casualty.

Nat'l Union, 441 F. Supp. 2d at 652-53 (internal quotation marks and citation omitted).

Given that there is no genuine issue of material fact as to whether the settlement is reasonably within the terms of Policy 3, and that OneBeacon has not argued that Fireman's settlement was otherwise unreasonable or reached in bad faith, the "follow-the-fortunes" doctrine applies.  As such, OneBeacon is bound to accept Fireman's settlement and allocation.

## CONCLUSION

For the reasons stated above, Fireman's motion for summary judgment is granted, and OneBeacon's motion for summary judgment is denied.  Fireman's will submit a proposed judgment, with an affidavit explaining its calculations, on or before **October 26, 2020**. OneBeacon's objections, if any, shall be served and filed by **November 2, 2020**.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 34, 44, 69).

Dated:  New York, New York
        October 19, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge